ROTOTRON CORPORATION, Plaintiff,

v.

LAKE SHORE BURIAL VAULT CO.,
INC., and Leo McQuestion,
Defendants.

No. 78–C–313.

United States District Court,
E.D. Wisconsin.

Dec. 13, 1982.

---

Alan K. Roberts, Posnack, Roberts, Cohen & Spiecens, New York City, Allan B. Wheeler, Wheeler, Morsell, House & Fuller, Milwaukee, Wis., for plaintiff.

Ronald Berry, Frisch, Dudek & Slattery, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

This is a civil action in which the plaintiff Rototron Corporation alleges that the defendant Lake Shore Burial Vault Co., Inc. and Leo McQuestion violated the provisions of a contract with the plaintiff. The Court ordered that trial was to be bifurcated with the question of damages, if any, reserved to a subsequent time. Accordingly, the Court conducted a two-day trial without a jury. The following is the Court's finding of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

The plaintiff Rototron Corporation (Rototron) is a New York corporation having its principal place of business at 115 Florida Street, Farmingdale, New York. Defendant Lake Shore Burial Vault Co. (Lake Shore) is a Wisconsin corporation having its principal place of business at 12780 Lisbon Road, Brookfield, Wisconsin. Defendant Leo McQuestion was the vice president of Lake Shore and was a resident of the State of Wisconsin when the action was commenced. Jurisdiction of the Court is properly invoked pursuant to 28 U.S.C. § 1332.

Beginning in 1972, the defendant Lake Shore, through Leo McQuestion, began searching for a method of molding a plastic septic tank. Prior to this, Lake Shore was involved in manufacturing concrete burial vaults and concrete septic tanks. Mr. McQuestion's search for a process which would allow Lake Shore to efficiently and inexpensively produce plastic septic tanks led him across the country and took a great deal of time. From 1972 to 1976, he visited seven different companies in Cuyahoga Falls, Ohio; Atlanta, Georgia; Hickory, North Carolina; Louisiana; Wilmington, Delaware; and South Bend, Indiana. At each of these places Mr. McQuestion viewed some method of rotational molding. Furthermore, none of the methods viewed met his requirements. However, none of the seven plants made plastic septic tanks. Many of the machines were too large and expensive for Lake Shore's needs.

In 1976, the defendant Leo McQuestion heard about the plaintiff Rototron. After getting the plaintiff's telephone number from the *Plastics Encyclopedia,* he called the plaintiff seeking information about its process, explaining that he desired to produce plastic septic tanks. One of the plaintiff's employees told Mr. McQuestion that one of their licensees in France produced plastic septic tanks using the Rototron process and that she thought the process might be what he was looking for. In addition, plaintiff sent defendant a brochure briefly explaining the process and showing some of the products created utilizing the process. Accompanying the brochure was a copy of a secrecy agreement which Mr. McQuestion would have to sign prior to entering plaintiff's plant. (Plaintiff's Exhibit 1.)

On October 14, 1976, the defendant Leo McQuestion, together with his brother, Hugh McQuestion, flew to New York to visit plaintiff's plant and view the Rototron process in operation. They were met at the airport by an employee of Rototron and taken to the offices of Rototron Corporation. There, they met with the president of Rototron Corporation and one of the sales employees and discussed the secrecy agreement, licensing agreement and the brochure that Mr. McQuestion had received earlier. After their discussions, the defendant, Leo McQuestion and Hugh McQuestion signed the secrecy agreement.[1] (Pltf's Exh. 1) At the time Leo McQuestion signed the agreement, plaintiff had not told him of any existing patents on the Rototron process,

---

1. In essence, the secrecy agreement recites that Rototron is in possession of certain secret technology and know-how regarding a plastic molding system and that defendants, in consideration for Rototron's confidential disclosure of the system, agree to maintain secrecy regarding the system and agree not to use the system without Rototron's permission.

but Leo McQuestion testified in response to a question from the Court that he assumed that there were patents on the process. (Trial Transcript at 43). In spite of this assumption, Mr. McQuestion voluntarily signed the secrecy agreement because he was very anxious to view the Rototron process which he believed might resolve his quest for a process to make plastic septic tanks. He also testified that prior to viewing the Rototron process, he had never seen any open flame or rotational molding equipment or any advertisement for such equipment. (Trial Transcript at 59–62).

After signing the secrecy agreement, the plaintiff's employee took the defendant Leo McQuestion to County Plastics. County Plastics is a corporation owned by the president of Rototron Corporation and a licensee of Rototron. Rototron Corporation takes all prospective licensees to County Plastics to view the Rototron process in operation. Secrecy at the County Plastics plant is very tight. No one who has not signed a secrecy agreement is allowed into the area where the Rototron Process is being used. In addition, the windows in the plant are fifteen feet high so that no one can look in and view the process without permission.

When Leo McQuestion went inside County Plastics, he viewed for the first time the Rototron process in operation. He testified that when he saw the equipment he mentally snapped his fingers and said, "That's it." Upon seeing the process, he knew how to put the equipment together and run it. (Trial Transcript at 88).

What Leo McQuestion viewed at County Plastics was the Rototron process. The Rototron process is a combination of a number of patented devices and a number of unpatented devices in systems which are arranged in a particular manner. The arrangement of these devices as well as the plant in general, makes up the Rototron process. It is the total arrangement of the common and uncommon patented devices which make up the process. The arrangement devised allows a business to operate a number of open flame rotational devices in a small area. It provides a great deal of flexibility, allowing for one person to operate several machines at once. In addition, the employees do not need any special training or ability to operate the machines. The process permits a speedy change in size of the molds without a significant change in the heating source. Molds can range in size from 1 gallon containers up to 500 gallon containers. In addition, through the use of the process, it is very simple to vary the thickness of each mold over each portion of any molded item. Finally, Mr. McQuestion viewed the automated version of the Rototron process. (Trial Transcript at 65–88, 162–186, 254–262).

Unlike conventional closed mold rotational molding, the Rototron process can be done in a very small area requiring inexpensive machinery and simple procedures. Compared to conventional methods of rotational molding, the Rototron process is less expensive and easier to use. Therefore, it allows easy entry into the plastic molding field because of the lack of high capital investment which attends other methods of rotational molding.

After visiting the Rototron Corporation and County Plastics, Mr. McQuestion returned to Wisconsin promising plaintiff that he would consider taking a license. Within one month after his visit to Rototron, Mr. McQuestion had set up, with the assistance of one of his employees, an open flame rotational molding device very similar to the one he observed at County Plastics. Lake Shore has been using this device to manufacture distribution boxes for septic tanks. Mr. McQuestion also testified that he had unsuccessfully attempted to make septic tanks using this process.

Even though defendants were utilizing what they had learned at Rototron without a licensing agreement, Mr. McQuestion continued to tell plaintiff that he was still considering taking a license. Plaintiff, in an effort to help him make his decision, arranged for its French licensee to ship one of its septic tanks to the defendants. Defendants were then supposed to bury the tank, pursuant to the legal requirements in Wisconsin, and test it. Because of a freak

tornado which hit the barn where the tank was stored, defendant never buried the tank. They did not, however, inform plaintiff of the accident until much later. In addition to sending the tank, the plaintiff also arranged for some officers of its French licensee to visit defendants in Wisconsin to discuss the manufacture of plastic septic tanks. It was after this visit that plaintiff learned defendants were utilizing a process very similar to its process.

Although there was no serious contest over the facts in this case, both parties have strongly contested which law should be applied to the case. Plaintiff argues that it is seeking only to enforce the secrecy agreement. Consequently, it contends that the Court should look only to the terms of contract in determining whether or not defendant breached the secrecy portion of the contract. In this regard, plaintiff maintains that the applicable law precludes the admission of parol evidence to alter defendants' obligation under the contract or to challenge the sufficiency of the stated consideration. As such, plaintiff maintains that defendants are estopped from denying the validity and enforceability of the contract and from denying the lack of trade secrets in the Rototron process. Finally, plaintiff contends that defendants' argument, discussed below, which focuses on whether trade secrets have been shown, is a sham and lacks merit.

Defendants approach the case from a different perspective, arguing that the law applicable to the protection of confidential information governs plaintiff's claims. They contend that, while a contract may create the confidential relationship between several parties, every case involving the alleged misappropriation of confidential information has as its threshold question whether, in fact, there was a protectable secret to be misappropriated. According to defendants, public policy prohibits the enforcement of contracts prohibiting use or disclosure of information which does not qualify for trade secret protection. Here, argue defendants, the information which plaintiff sought to protect through the secrecy agreement was actually in the public

domain at the time the parties entered into the contract. Thus, argue defendants, the contract is unenforceable and, in addition, there can be no liability based upon misappropriation of trade secrets.

The threshold question for the Court in a diversity case such as this is, of course, what substantive law to apply. Defendants have not addressed the choice-of-law issue, while plaintiff has raised the issue only to the extent that it contends the law with respect to parol evidence is the same in New York and Wisconsin. Thus, the Court must examine the choice-of-law issue without the benefit of any extensive briefing by the parties.

■ In diversity cases, federal courts must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Here, where the plaintiff's claims arise out of a contract entered into by the parties, it is appropriate to look to the Wisconsin choice-of-law rules for contract claims. In *Urhammer v. Olson,* 39 Wis.2d 447, 159 N.W.2d 688 (1968), the Wisconsin Supreme Court adopted the grouping-of-contacts approach for the resolution of conflicts questions pertaining to the validity and rights created by the provisions of a disputed contract. This approach is embodied in Section 188 of the Second Restatement of Conflicts, which provides:

188. Law Governing in Absence of Effective Choice by the parties.

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, as to that issue, has the most significant relationship to the transaction and the parties under the principles stated in sec. 6.

(2) In the absence of an effective choice of law by the parties (see sec. 187), the contacts to be taken into account in applying the principles of sec. 6 to determine the law applicable to an issue include:

(a) the place of contracting

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contracts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in secs. 189–199 and 203.

■ In the present case, there is no effective choice-of-law provision contained in the secrecy agreement entered into by the parties. Thus, the Court must consider the contacts listed in section 188(2) as they relate to the facts of this case. As noted by the Wisconsin Supreme Court in *Haines v. Mid-Century Ins. Co.*, 47 Wis.2d 442, 177 N.W.2d 328 (1970), the Court should not merely count the contacts "but rather [it must] consider which contacts are the most significant and ... determine where those contacts are found." *Id.* at 447, 177 N.W.2d 328.

■ In the present case, the Court concludes that the significant contacts lay in New York. Indeed, of the five contacts listed in section 188(a), there appear to be none that would dictate the application of Wisconsin law in this case. First, although the Court views the contact to be of limited importance, the contract at issue was entered into in New York. The second potential contact—the place of negotiation of the contract—also has little significance in the context of this case. The evidence presented showed that the secrecy agreement was a standard agreement which defendants signed without any negotiations. The third potential contact also has little significance in the instant case. The only affirmative performance of the agreement to be undertaken by the plaintiff was its demonstration of the Rototron process for defendants, which took place in New York. Defendants' only requirement under the secrecy agreement was to maintain secrecy regarding the process and to refrain from using it. Thus, it can hardly be said there was a "place of performance" with respect to defendants' end of the agreement. The fourth potential contact—the location of the subject matter of the contract—is one which the Court deems to be significant in this case. The subject matter of the secrecy agreement was the Rototron process itself. This process was demonstrated for defendants by the New York plaintiff in New York. The demonstration which defendants viewed became the model used by them to set up an almost identical molding system. The fifth potential contact is significant in this case only to the extent that plaintiff is a New York corporation having its principal place of business in that state.

Considering the foregoing contacts, the Court concludes that New York law applies in the instant case. Unfortunately, neither party has discussed in any detail the application of New York substantive law as to the facts in this case. The Court, therefore, must endeavor to determine how a New York court would decide this case.

Before discussing the substantive law of New York as it applies to this case, however, the Court finds it necessary to determine what the real factual and legal issues in this case are. As stated previously, the parties have taken different approaches to the case. Although plaintiff approached this case as a trade secret case in an earlier proceeding in which the Court granted a request for a preliminary injunction, plaintiff now relies on the simple terms of the secrecy agreement as the basis for requesting relief. It argues that the unambiguous language of the contract must be enforced and that defendants are estopped by the parol evidence rule from challenging the enforceability of the contract. The Court agrees with defendants that the plaintiff's reliance on the parol evidence rule is misplaced. As noted in their post-trial reply brief (p. 6), defendants at no point have claimed that parol evidence is required to interpret any ambiguous terms in the secrecy agreement. Rather, it is defendants' position that the Court must consider the

evidence presented to determine whether the agreement is enforceable. In defendants' view, the contract is unenforceable if the Rototron process was not, in fact, a trade secret at the time the process was demonstrated to defendants.

What the Court must determine, therefore, is the appropriate rule of law in New York with respect to the enforceability of contracts such as the one entered into by the parties here.

The Court concludes that whether the case is approached as a trade secrets case or as a contract case, a preliminary issue under either approach must be whether there were secrets whose revelation could constitute consideration.

■ The Court has no reason to believe that a New York court would take a position any different than that stated in *Wheelabrator Corp. v. Fogle,* 317 F.Supp. 633 (W.D.La.1970), in which the court stated:

> While trade secrets will be protected where a confidential relationship exists even in the absence of a contractual agreement to that effect, a contractual agreement without more does not afford such protection. It must be shown that the processes or machinery here are in fact trade secrets and that access to them was gained in confidence. *Id.* at 637.

In *Heyman v. Winarick, Inc.,* 325 F.2d 584, 587 (2d Cir.1963), the Second Circuit, applying New York law, acknowledged that "an express agreement is not a prerequisite to the establishment of a confidential relationship." *Id.* at 586. The court went on to state: "A relationship of trust and confidence may naturally result from the circumstances surrounding the dealings between the parties." *Id.* at 587. The implication of the court's statements is that, whether or not there is an express agreement establishing the confidential relationship, the analysis of the aggrieved party's claims would be the same. The Court concludes, therefore, that under New York law, the plaintiff's claim, although founded on the secrecy agreement, must be analyzed under the law regarding misappropriation of confidential information.

The elements which must be proved to establish a misappropriation of confidential information are summarized in the court's opinion in *Wheelabrator Corp. v. Fogle,* 317 F.Supp. at 637:

> The essential elements of a cause of action for breach of confidence are
>
> (i) possession by the plaintiff of knowledge or information which is not generally known,
>
> (ii) communication of this knowledge or information by the plaintiff to the defendant under an express or implied agreement limiting its use or disclosure by the defendant, and
>
> (iii) use or disclosure by the defendant of the knowledge or information so obtained in violation of the confidence, to the injury of the plaintiff.

In the instant case, the evidence clearly shows that plaintiff satisfied the second and third elements set forth above. With respect to element two, the evidence presented established that plaintiff did, in fact, communicate knowledge and information regarding the Rototron process to defendants pursuant to an agreement limiting defendants' use or disclosure of the process. With respect to element three, the evidence clearly showed that defendants used the knowledge and information obtained from plaintiff to set up their own open flame rotational molding device almost identical to plaintiff's system.

The factual issue the Court must determine, therefore, is the first element of inquiry—whether the information which the defendants used was, in fact, confidential. There can be no doubt that, as between the parties, it was certainly treated as such. The language of the confidentiality agreement of October 14, 1976 (Plaintiff's Ex. 1) makes this clear. Leo McQuestion, in his early negotiations seemed to acknowledge the need to take a license if he was going to use the revelations to make plastic septic tanks. To be sure, his subsequent course of conduct leads the Court to believe and find that this was merely a "stall", and his bla-

**698**

tant utilization of the information to actually build and use the rotational molding process does not speak well for his integrity.

 But the question is not resolved merely by deciding that defendant McQuestion broke his word, nor is it resolved by the words of the contract. Plaintiff argues that by signing the agreement, McQuestion admitted that the Rototron process is a secret and is barred from contending the contrary. However, it is the function of the Court, not the bargaining parties, to determine whether the information disclosed is a trade secret. *Wheelabrator Corp. v. Fogle, supra.* Important principles of federal patent law and New York trade secret law become intertwined at this point. The subject matter of a claimed trade secret must, of course, be secret to be entitled to protection. As set forth in the Restatement of Torts:

Matters of public knowledge or general knowledge in an industry cannot be appointed by one as his secret * * * substantially a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietors of the business know it. He may without losing his protection communicate it to his employees involved in its use. He may likewise communicate it to others pledged to secrecy * * * Nevertheless a substantial element of secrecy must exist, so that except by use of improper means, there would be difficulty in acquiring the information. Restatement of Torts, § 757 comment to (1939).

 A trade secret has value only so long as the knowledge involved can be concealed. The opposite situation pertains to patented information. In order to foster invention and reward those who expand human knowledge, our nation grants a monopoly for the life of a patent on the invention or process disclosed in the claims. But the price for this reward is full disclosure. The knowledge passes into the public domain, and thereafter the patentee's only protection is that afforded under the patent law. The federal patent law preempts

state laws under which any other protection might be sought. To be entitled to such protection, of course, the claims must represent genuine invention and withstand attacks upon their validity in an infringement action.

Here defendants argue that the Rototron process was not a trade secret when it was disclosed to McQuestion, because plaintiff had obtained at least six different patents relating to rotational molding processes prior to the disclosure trip which McQuestion made through County Plastics. Prior to October 14, 1976, the following patents issued to plaintiff:

1. U.S. Patent No. 3,676,037 issued July 11, 1972 to Stewart Pivar entitled Apparatus for Molding Hollow Plastic Articles;

2. U.S. Patent No. 3,810,727 issued May 14, 1974 to Stewart Pivar entitled Thermally controlled Apparatus for Molding Hollow Plastic Articles and the Like;

3. U.S. Patent No. 3,825,395 issued July 23, 1974 to Stewart Pivar entitled Apparatus for Molding Hollow Plastic Articles;

4. U.S. Patent No. 3,841,821 issued October 15, 1974 to Stewart Pivar entitled Apparatus for the Rotational Molding of Thermo-Plastic Articles;

5. U.S. Patent No. 3,703,348 issued November 21, 1972 to Stewart Pivar entitled Apparatus for Molding Hollow Objections from Thermo-Plastic Materials; and

6. U.S. Patent No. 3,914,105 issued October 21, 1975 to Stewart Pivar entitled Multiple Piece Mold Apparatus and Method to Manufacture Hollow Articles.

The existence of these patents, defendants contend, placed the Rototron process in the public domain and hence the process could not be a "trade secret."

Plaintiff argues that there were many trade secrets regarding the Rototron process which were not disclosed in the patents. According to plaintiff, the process itself,

not merely the issued patents, constitutes a trade secret. They point to the arrangement of the machines; the use of laborers rather than skilled molders to operate the machines; the use of rectangular tubing for making burners; the use of bolts dropped in the burner outlets to make the heating burners correspond to the length of the mold being used; and the use of ordinary C-clamps to hold parts together as constituting "secrets" that made the Rototron process useful and profitable.

█ The Court has examined the patents introduced and finds that they do disclose all of the elements of the Rototron process so as to place the process within the public treasury of knowledge. U.S. Patent No. 3,703,348 (Defendants' Exhibit 2) and U.S. Patent No. 3,841,821 (Defendants' Exhibit 5) are particularly persuasive in this regard. Whether they would be able, in an infringement action, to withstand attacks based on obviousness is problematic. But this need not be decided and is mentioned only because it explains why plaintiff adopted the strategy of treating the Rototron process as if it were a trade secret and then going through the elaborate process of secrecy and licensing involved here.

The Court further, having heard the witnesses and having examined the transcript of the trial, concludes that none of the techniques (noted above) so theatrically concealed at the County Plastics factory and then revealed to McQuestion under the Confidentiality Agreement amount to "trade secrets" such that they could constitute consideration for the contract in question.

Having determined that New York law should govern questions of contract and trade secret law, and then resolving the case on the supremacy of federal patent law and the incompatibility of "patent disclosures" and "trade secrets", the Court would note that at the time of trial there was no New York case law bearing directly on the point. Subsequent to trial, the case of *Laurie Visual Etudes v. Cheseborough-Ponds,* 83 A.D.2d 505, 441 N.Y.S.2d 88 (App.Div. 1981) wound its way through the New York

court and bolsters the Court in its decision here. At the trial level, the Court dismissed defendants' affirmative defense that plaintiff could not recover because the concept involved had been made public with the issuance of a patent in 1972. The trial judge believed that although publications by way of patent would destroy a trade secret with respect to those who used the published information without taking advantage of a confidential disclosure, those who acquired the knowledge by way of confidential disclosure are barred from appropriations. At the appellate level, the case was reversed with the statement that:

> the trial court's conclusion in this regard was incorrect. Under New York law, a plaintiff may not recover for a trade secret when the novelty of the idea has been lost through the issuance of a patent. *Ferber v. Sterndent Corporation,* 51 N.Y.2d 782, 433 N.Y.2d 85, 412 N.E.2d 1311.

█ Based on the foregoing, the Court concludes that plaintiff's remedy is within the patent law and finds plaintiff's course here to be without merit.

There is also the matter of plaintiff's motion made after the on-site visit, to find defendants in contempt of the Court's preliminary injunction for failure to maintain outside public view the rotational molding devices it had manufactured and had strewn about its plant.

█ A finding of civil contempt must be based upon clear and convincing evidence that the Court's order has been violated. Here, although the evidence indicates considerable casualness in the defendants' compliance with the preliminary injunction, including failure to adequately screen its machines even to the point of negligently permitting some workmen to throw components of one machine outside in the junk pile, the Court has not been convinced that the deviations were calculated, nor so gross as to reveal the plaintiff's information to anyone who could use it. These devices and their components were, after all, very ordinary in appearance, and

individual pieces would not be perceived as secrets by the casual observer. The Court feels that the deliberate and intentional conduct required for a finding of contumacious behavior is absent. Further, except as an affront to the efficacy of the injunction, the issue has become moot with the decision here.

Accordingly, the preliminary injunction previously granted is DISSOLVED and the complaint is DISMISSED, with costs.