**Norton J. LEHMAN, Plaintiff-Appellant,**

v.

**DOW JONES & COMPANY, INC.,
Defendant-Appellee.**

**No. 40, Docket 85–7370.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1985.

Decided Jan. 30, 1986.

Marvin E. Frankel, Michael S. Oberman, David S. Frankel, New York City (Kramer, Levin, Nessén, Kamin & Frankel, New York City), for plaintiff-appellant.

Michael B. Mukasey, New York City (Patterson, Belknap, Webb & Tyler, New York City), for defendant-appellee.

Before FRIENDLY, MANSFIELD and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

Plaintiff Norton J. Lehman is a California attorney who devotes most of his professional time to working as a "finder" of corporate acquisition deals, primarily concerning cable television companies. During the period in which the events described herein took place, Lehman maintained his office in Beverly Hills, California. Defendant Dow Jones & Company, Inc. ("Dow Jones") is a publicly held Delaware corporation with its principal executive and editorial offices in New York City, where it engages in a variety of activities

including publication of *The Wall Street Journal.* The present action relates to services allegedly rendered by Lehman in connection with Dow Jones' acquisition of a substantial equity interest in Continental Cablevision, Inc. ("Continental"). Lehman has pleaded six theories of liability. The first four—breach of express contract, breach of implied contract, unjust enrichment, and *quantum meruit*—relate to Dow Jones' alleged breach of an oral contract to pay Lehman a finder's fee if he was a procuring cause of Dow Jones' acquiring an interest in Continental. The parties and the district court have treated these together under the style of "contract-like" claims.[1] In a fifth claim, Lehman asserts that Dow Jones promised to pay him for his services without any present intention of doing so, thus fraudulently inducing him to perform such services. In a sixth claim, Lehman asserts that Dow Jones breached an agreement not to use or disclose certain allegedly confidential information.

The action was originally brought in the District Court for the Central District of California, with federal jurisdiction predicated on diverse citizenship, 28 U.S.C. § 1332, but was transferred, on Dow Jones' motion, to the Southern District of New York. There Dow Jones moved for summary judgment. It argued that the "contract-like" claims were barred by the "finder's provision" of the New York statute of frauds,[2] that the fraud claim was simply a contract claim in disguise, and that the breach of confidence claim failed as a matter of law and in any event could not be substantiated. The court granted the motion.

The salient facts are as follows:[3] Lehman's first contact with Dow Jones took place in the fall of 1979 when he endeavored to interest it in the acquisition of a cable company that he was representing. Warren R. Phillips, chairman and chief executive officer of Dow Jones, referred him to George W. Flynn, its senior vice president in charge of acquisitions, who was based in New Jersey. Flynn said that Dow Jones was interested in acquiring cable companies and would welcome information about Lehman's client, which Lehman promptly sent. Several months later, Flynn wrote from New Jersey indicating lack of interest. However, in a subsequent telephone conversation Flynn informed Lehman that Dow Jones was very much interested in acquiring cable systems, authorized him to find one, and offered to pay him a finder's fee if he procured such an acquisition for Dow Jones. Lehman claims

1. The assimilation is justified since all four claims would be barred if the provision in the New York statute of frauds regarding finder's fee agreements, N.Y.Gen.Oblig.Law § 5–701(a)(10), were applicable. *See Philo Smith & Co., Inc. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir. 1977); *Minichiello v. Royal Business Funds Corp.*, 18 N.Y.2d 521, 525, 277 N.Y.S.2d 268, 270, 223 N.E.2d 793, 794 (1966), *cert. denied*, 389 U.S. 820, 88 S.Ct. 41, 19 L.Ed.2d 72 (1967); Farnsworth, *Contracts* § 6.11, at 434 (1982).

2. This provision reads:
   Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

   .   .   .   .   .

   Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman. N.Y.Gen.Oblig.Law § 5–701(a)(10).

3. Since summary judgment was rendered against Lehman, we must follow his version of the facts for purposes of this opinion unless it is conclusively refuted by other evidence. In fairness, however, we should state that Dow Jones denies many of Lehman's allegations and contends that its relationship with him was considerably less warm than he asserts.

that on the basis of these representations he began to search for promising acquisition prospects.

In May 1980, Lehman sent Phillips and Flynn information about another cable company; in this letter he stated he was "going forward on this matter as a finder for Dow Jones on the Goldman, Sachs & Co. formula of 5–4–3–2–1% of the total consideration ... to be paid me by Dow Jones."[4] Flynn telephoned from New Jersey indicating lack of interest because the company was too small, but he thanked Lehman and encouraged him to investigate further acquisition candidates for Dow Jones.

Lehman's next potential acquisition candidate was a California company in the specialty publishing field. In a letter to Flynn, he stated that he was proceeding on the basis that he would be paid a 4% fee. Flynn telephoned that the proposed fee arrangement was a fair one, but that Dow Jones was not interested in acquiring that company. However, Flynn confirmed Dow Jones' interest in acquiring a cable company and encouraged Lehman's continued efforts.

This was followed by a more extensive effort with respect to Dow Jones' possible acquisition of Falcon Communications ("Falcon"), a California-based cable company. On this occasion Lehman telephoned Phillips in New York and was referred to Ray Shaw, Dow Jones' president. Shaw indicated that Dow Jones might be interested in Falcon and agreed that it would pay Lehman a finder's fee should the acquisition close. On January 9, 1981, Lehman wrote Shaw a long letter in regard to Falcon; the letter repeated that Lehman was "going forward on the 'standard' Lehman or Goldman, Sachs formula," which the letter subsequently spelled out. *See supra* note 4. As a result of a further telephone call with Shaw, a meeting was held in New York between the president of Falcon, his lawyer, and Lehman and Phillips, Shaw, and other Dow Jones officials on January 14, 1981. During the meeting Shaw confirmed to Falcon's president that Lehman was representing Dow Jones in the proposed transaction. Ultimately no transaction occurred.

In June 1981 Lehman proposed another acquisition to Frederick Harris, Dow Jones' vice president of finance. This time Lehman proposed that his fee should be based on the "Daniels" formula, to wit, 5% of the first ten million dollars and 1% of each successive million of the total acquisition price. Harris agreed to the formula. Again nothing occurred.

This was the background for Lehman's proposal of Continental as a candidate for acquisition. Lehman had been following the company for some time. In the fall of 1981 he learned that it intended to make a public offering. Lehman did not consider the proposed offering price range to be realistic, advised Continental officials to that effect, and suggested that an alternative to a public offering would be a sale to one of the companies he represented. Timothy Neher, Continental's vice president and treasurer, agreed to send Lehman Continental's preliminary prospectus dated August 20, 1981, which had been filed with the SEC in anticipation of the proposed public offering but was not yet available to the public. The understanding was that Lehman could use it for the purpose of making an analysis, which he could communicate to the companies he represented. On September 11, 1981, Lehman had a telephone conversation with Harris in New Jersey. Harris, who knew of Continental's proposed public offering, said there was no point in attempting to deal with the company under such circumstances; but Lehman, on the basis of his prior talks with Continental officers, insisted to the contrary. Harris agreed that Lehman would go forward on a 1% compensation formula and that Dow Jones would keep his information confidential. On September 14, 1981, Leh-

---

**4.** This formula, sometimes also described as the "Lehman" formula (no reference to plaintiff), means that the finder is paid 5% of the first million, 4% of the second million, 3% of the third million, 2% of the fourth million, and 1% of the balance of the total acquisition price.

man sent Dow Jones a five page submission letter dated September 10, 1981, containing an analysis of Continental based on his study of the preliminary prospectus. The letter confirmed the agreement on a 1% compensation formula and emphasized the confidentiality of the information regarding Continental, requesting that it not be disclosed to anyone outside of Dow Jones without first conferring with Lehman. On September 15, 1981, Harris telephoned Lehman that Dow Jones was not interested in going forward with the proposed Continental acquisition.

On September 24, 1981, George Wiegers, a partner of Lehman Brothers Kuhn Loeb, Inc., met with Shaw and Harris and suggested the availability of Continental. Lehman thinks he may have inadvertently brought this about. After Harris had disclaimed any interest by Dow Jones in Continental, Lehman suggested to Continental that LIN Broadcasting might be a prospective suitor and recommended that it "check out" LIN with F. Warren Hellman, a former Lehman Brothers partner known to both Continental and LIN. Lehman asserts, based on deposition testimony from Harris, that Wiegers told Shaw and Harris at the September 24 meeting that, although he had not yet spoken with anyone at Continental, he knew the company would be receptive to an equity investment because of his recent contacts with Hellman. Harris had Lehman's September 10 submission letter with him at the meeting and showed it to Wiegers, who remarked, "Well, if something goes through, we might have a problem later on." As a result of the meeting, negotiations took place between Dow Jones and Continental, and in November 1981 Dow Jones acquired a $78 million minority interest in the company. Although there was no written agreement, Dow Jones paid Lehman Brothers a finder's fee of $780,000, representing 1% of the value of the transaction.

As stated, Judge Conner granted Dow Jones' motion for summary judgment. The bulk of his opinion concerned the "contract-like" claims. The initial problem here was that New York's statute of frauds contains the special finder's provision quoted in note, 2 *supra*, while California's statute of frauds does not. Judge Conner began by deciding, with obvious correctness, that, despite *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), he, as a transferee judge, must apply the choice of law rules of the state—to wit, California—where the transferor court sat. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964). He characterized these rules as "a hybrid of 'governmental interest' analysis and 'comparative impairment' analysis," citing *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 161–65, 583 P.2d 721, 723–26, 148 Cal.Rptr. 867, 869–72 (1978) (*en banc*), and *Bernhard v. Harrah's Club*, 16 Cal.3d 313, 320–23, 546 P.2d 719, 723–26, 128 Cal. Rptr. 215, 219–22 (*en banc*), *cert. denied*, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). He identified the policy of the pertinent section of New York's statute of frauds as being "designed to protect against sham claims for commissions, thereby enhancing the state's position as a national business center, especially for negotiation of the kind of corporate transactions involved in this case," citing *Hutner v. Greene*, 734 F.2d 896, 899 (2 Cir.1984), and *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382–83, 300 N.Y.S.2d 817, 826–29, 248 N.E.2d 576, 582–84 (1969). On the other hand, California's interest lies in " 'upholding the reasonable expectations of its residents who are parties to agreements that would be valid and enforceable absent any [Statute of] Frauds restriction,' " the quoted language being from *Denny v. American Tobacco Co.*, 308 F.Supp. 219, 223 (N.D.Cal.1970), a diversity case applying California choice of law rules. Following the approach signalled by Justice Traynor's seminal article, *Is This Conflict Really Necessary*, 37 Texas L.Rev. 657 (1959), Judge Conner found that there was no true conflict here because California's interest lay only in protecting the *reasonable* expectations of its residents: Lehman, as a professional finder,

"should have known that the New York Statute of Frauds would govern his dealings with Dow Jones, and accordingly, he could not have held a reasonable expectation that his alleged oral contract for a finder's fee would be enforceable." Since California thus would find that its interests were not implicated, it would apply the New York statute of frauds. The judge then went on to hold that the exception for an attorney at law in the New York finder's provision did not apply to Lehman because he was not admitted to practice in New York.

Turning to the fraud claim, Judge Conner ruled, citing *Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888, 889, 193 N.Y.S.2d 859, 860 (1st Dep't 1959), that Lehman could not avail himself of such a claim because this would circumvent the statute of frauds. He also sustained Dow Jones' position with respect to the breach of confidence claim, finding that the information given to Dow Jones was derived wholly from public sources and that, even if this were not true, Lehman had forfeited any claim to confidentiality by disseminating the same information to at least four other companies, in one instance without even requesting that it be held in confidence. Accordingly, he granted Dow Jones' motion for summary judgment *in toto*, 606 F.Supp. 1152. This appeal by Lehman followed.

## DISCUSSION

### 1. *The "Contract-Like" Claims*

■ We do not agree that California would find its policy of protecting the reasonable expectations of its residents inapplicable to Lehman. Putting aside that even if Lehman had read the New York statute of frauds he would have discovered that on its face the finder's provision was inapplicable to him as an attorney, *see infra*, the argument assumes not only that Lehman knew or ought to have known that the finder's provision existed in the first place, but also that he should have conclud-

ed that California would choose to apply the New York statute of frauds rather than its own—the very point here at issue. Beyond this we do not think California would consider that one of its residents lacks a reasonable expectation of compensation because he knows that a statute of frauds can be successfully invoked against him. Many oral contracts within statutes of frauds are performed, as was Dow Jones' contract with Lehman Brothers in this very case. When a finder has repeatedly put a responsible company like Dow Jones on notice that he expects a fee, and when the company has orally agreed to pay one, as Lehman alleges, the finder has a reasonable expectation of obtaining a fee even if he is also aware that the corporation may take shelter under a statute of frauds. *Denny v. American Tobacco Co.*, 308 F.Supp. 219 (N.D.Ca.1970), is not to the contrary. Denny had no contract, oral or written, for the payment of a fee by the defendant, as Lehman alleges he had with Dow Jones. Beyond this the judge in *Denny* rested his decision at least partly on the view, *see id.* at 223–24, that California would have deferred to New York even if Denny's expectations had been reasonable—in other words, he concluded there was a conflict but predicted that California would defer to New York law.

■ Here, we agree with Judge Conner that there is no need to resolve any conflict, though for a different reason and with an opposite result. As developed below, we hold that the exemption for an attorney at law in the finder's provision of the New York statute of frauds is not limited to New York attorneys. Hence it makes no difference whether California would apply its own law or look to New York's.

Anyone reading only the words of the New York finder's provision, as Dow Jones says Lehman should have done, would have thought that an attorney at law, whether licensed by New York or by some other state, enjoyed the benefit of the exemp-

tion.[5] That is what the words say, and no reason why they should not be so read is immediately apparent. Both the New York Court of Appeals and this court have recognized that finders who fall within the words of the attorney-at-law exemption should not be deprived of the benefits of seemingly valid oral contracts by reading qualifications into the exemption that do not appear on its face. Thus, the New York Court of Appeals has declined to narrow the exemption to cases where an attorney-client relationship existed, *Rever v. Kayser-Roth Corp.*, 26 N.Y.2d 652, 308 N.Y.S.2d 384, 256 N.E.2d 540 (1970), and we have refused to limit the exemption to cases where an attorney was actually engaged in the practice of law, *Hutner v. Greene*, 734 F.2d 896, 900 (2 Cir.1984) (attorney who had not practiced for almost fifty years entitled to benefit of exemption). Beyond this, the legislature's failure to use the phrase "duly licensed" with respect to attorneys, as it did with respect to real estate brokers and salesmen, *see supra* note 2, would suggest that it did not mean to impose a geographical limitation.

Dow Jones makes several objections to this reading of the finder's provision. The first is that authorities establish that the words "attorney at law" used in the exemption mean only attorneys licensed to practice by New York. The authorities cited are *Hutner, supra,* and *Harris v. Sobel*, 31 A.D.2d 529, 295 N.Y.S.2d 181 (1st Dep't 1968).[6] The attorneys involved in these cases were New York attorneys, and the opinions indeed characterized them as such. But there is nothing to indicate that either the Appellate Division in *Harris* or this court in *Hutner* focused on the question whether an attorney licensed to practice by another state was entitled to the same benefit as one licensed by New York.[7]

Lehman urges us to stop at this point, citing recent expressions in decisions of the New York Court of Appeals that "resort to extrinsic matter is inappropriate when the statutory language is unambiguous and the meaning unequivocal," *Sega v. State*, 60 N.Y.2d 183, 191, 469 N.Y.S.2d 51, 55, 456

---

**5.** We put aside Dow Jones' argument that construing the exemption to include an attorney licensed by California would necessarily entail that attorneys licensed by Iran must also be exempted.

**6.** *Harris* presented the issue on which the Appellate Division had already ruled in *Rever v. Kayser-Roth Corp.*, 29 A.D.2d 920, 290 N.Y.S.2d 154 (1st Dep't 1968), *aff'd*, 26 N.Y.2d 652, 308 N.Y.S.2d 384, 256 N.E.2d 540 (1970); to wit, whether the exemption in the finder's provision was limited to cases where an attorney-client relationship existed.

**7.** Dow Jones also attempts to find authority supporting its position in *Minot v. Hoyt Bros., Inc.*, 53 N.J.Super. 332, 147 A.2d 92 (1958), and *Ferrario v. Great Pac. Century Corp.*, N.Y.L.J., Jan. 16, 1985, at 11, col. 7 (Sup.Ct.N.Y.Co.) (Stecher, J.). *Minot* held that the exemption of attorneys from New Jersey's requirement of a license for engaging in the business of a real estate broker or salesman, N.J.Stat.Ann. §§ 45:15–1, :15–4, does not apply to out-of-state attorneys. Dow Jones points out that New York's requirement of a license for engaging in the business of a real estate broker or salesman contains a similar exemption for attorneys, N.Y. Real Prop.Law § 442–f (McKinney 1968), and draws our attention to Justice Stecher's remarks in *Ferrario* that "[t]he laws of New York and New Jersey do not differ substantially with respect to the real estate brokerage calling" and that "[t]he purpose of the brokers regulatory statutes is substantially the same in New York and New Jersey." These remarks, Dow Jones argues, show that New York would follow New Jersey in limiting its exemption to in-state attorneys.

We fail to see the significance in this. *Ferrario* did not hold that the exemption in the New York statute is unavailable to out-of-state attorneys—nor could it have, since the case involved an attorney admitted to the New York bar. Moreover, Justice Stecher's general remarks cannot be taken as a sign that New York would follow New Jersey in limiting its exemption to in-state attorneys. The result in *Minot* is readily explicable in view of New Jersey's position that its attorney exemption applies only "to attorneys whose brokerage services are 'performed in carrying out their professional responsibilities in the practice of law.'" *Ferrario, supra* (quoting *Spirito v. New Jersey Real Estate Comm'n,* 180 N.J.Super. 180, 434 A.2d 623 (1981)). Dow Jones has cited nothing to indicate that New York takes a similarly narrow view. Finally, even if New York were to hold that only in-state attorneys may take advantage of the exemption in N.Y.Real Prop.Law § 442–f, this would not control the outcome of the present case, which involves a different statute and a different issue.

N.E.2d 1174, 1178 (1983), and that the "court will not add words to a statute which has a rational meaning as written." *Richmond Constructors v. Tishelman*, 61 N.Y.2d 1, 6, 471 N.Y.S.2d 58, 60, 459 N.E.2d 167, 169 (1983). However, as in the case of our own decisions and the Supreme Court's with respect to federal statutes, *see* Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L.Rev. 195 (1983), it is easy to find statements of the Court of Appeals directly to the contrary. *See, e.g., Uniformed Firefighters Association, Local 94 v. Beekman*, 52 N.Y.2d 463, 471, 438 N.Y.S.2d 746, 749, 420 N.E.2d 938, 941 (1981) (" '[T]he absence of ambiguity facially is never conclusive.' ") (quoting *New York State Bankers Association v. Albright*, 38 N.Y.2d 430, 434, 381 N.Y.S.2d 17, 343 N.E.2d 735 [ (1975) ] ). The fact is that the case "[w]here the language is plain and admits of no more than one meaning," *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917), is exceedingly rare.[8] Dow Jones' limited reading of the exemption, while not the most natural, would be within the bounds of reason if there were evidence to support it. We therefore proceed to consider Dow Jones' arguments that the purpose and history of the statute require that the words "attorney at law" should be limited to attorneys licensed by New York.

Basically, these arguments begin with the proposition that the exemption for "duly licensed" real estate brokers applies only to real estate brokers licensed by New York. The rationale for such an exemption was that since real estate brokers were subject to an established New York regulatory mechanism, which permitted them to be disciplined for making unwarranted claims for commissions, there was no need for subjecting them to the statute of frauds. *See Koontz v. Astronics Corp.*, 108 Misc.2d 1049, 439 N.Y.S.2d 274 (Sup.Ct. 1981). It is then argued that the rationale for exempting attorneys must have been the same and that the extent of the exemp-

tion must therefore be subject to the same limitation, namely, that it applies only to attorneys licensed by New York. While New York does not require auctioneers to be licensed, § 21 of the General Business Law does require a writing signed by the customer if the auctioneer's compensation is to exceed two and one half percent of the amount of the sale.

The source of the New York finder's provision was an amendment to the statute of frauds proposed in 1948 by the New York Law Revision Commission, *see* N.Y. Legis.Doc. 1949, No. 65(G) [hereafter *"LRC Recommendation"*], and enacted by the legislature in 1949, *see* Act of March 18, ch. 203, 1949 N.Y.Laws 387. This amendment was identical to the present statute except that it did not contain the language with respect to implied contracts, which was added in 1964, *see* Act of April 16, ch. 561, 1964 N.Y.Laws 1533. The recommendation of the Law Revision Commission began by stating that under Article 12A of the Real Property Law real estate brokers were required to obtain licenses from the Secretary of State but business brokers were not. The Commission believed that the statute of frauds, then § 31 of the Personal Property Law, "should be made applicable to contracts for compensation for services rendered in the sale of a business opportunity, business, or interest therein." *LRC Recommendation* at 7. It also believed that "statutory provisions requiring authentication of the fact of employment would be beneficial to the public and to licensed real estate brokers alike" and declared that the proposed amendments were intended to accomplish that result. *Id.* at 8. However, less comprehensive requirements as to the nature of the writing were thought necessary for real estate brokers, since "[t]he real estate broker is a member of a licensed calling, and is subject to discipline and supervision" and "[h]ence unethical conduct can be investigated and punished by the administrative supervision which licensing involves."

---

**8.** *Caminetti* certainly was not such a case, though the majority held it to be. *See* Justice

McKenna's dissent, 242 U.S. at 496, 37 S.Ct. at 194.

*Id.* Thus, in addition to the amendment of the statute of frauds, the Commission proposed adding a new section, § 442–i, to the Real Property Law setting forth special writing requirements applicable to contracts for commissions for services rendered by "duly licensed real estate brokers." All the new section would require was that "some note or memorandum identifying the transaction and authorizing or ratifying the rendering of the services be in writing, and subscribed by the person agreeing to pay such commission or by his lawful agent." *See id.* at 9–10. Even this would not be required if the broker sent the customer written notice "identifying the transaction and setting forth the terms on which such services are to be rendered under an oral agreement," unless an objection to the contents of the notice was made within ten days after its receipt. *See id.* at 10. Both this proposed addition to the Real Property Law and the proposed amendment of the statute of frauds contained language exempting auctioneers and attorneys at law from the writing requirements provided therein.

Only the amendment of the statute of frauds passed the legislature; the proposed amendment of the Real Property Law—which would have created a mini-statute of frauds for real estate brokers—did not pass. Thus, real estate brokers received a broader exemption from the statute of frauds than the Commission had thought their licensure warranted. All that was said in the Commission's recommendation with respect to attorneys and auctioneers was: "Attorneys at law and auctioneers are excluded." *Id.* at 7, 9. There was not a word to indicate that the attorney exemption was limited to attorneys licensed by New York, nor could there have been any to indicate such an intention with respect to auctioneers, who were not subject to licensing at all.

We find no sufficient basis in this legislative history for drawing the conclusion that Dow Jones urges. The argument that the legislature meant to limit all the exemptions to persons subject to disciplinary action by New York shatters on the rock that auctioneers are not so subject: they are not licensed by the state in any fashion, and the special statute of frauds applicable to them, § 21 of the General Business Law, does not cover transactions where the commission is less than two and one half percent of the amount of sale. Furthermore, the argument errs in assuming that only attorneys licensed by New York are subject to disciplinary action there. For example, when an attorney from another state comes to New York City to participate in business transactions, the Disciplinary Committee of the First Department will notify the appropriate jurisdiction of complaints of unethical conduct. *See First Annual Report of the Departmental Disciplinary Committee, First Judicial Department* 5 (1981). In the past, complaints concerning the behavior of attorneys outside that Committee's jurisdiction—both out-of-state attorneys and attorneys admitted in other departments—have amounted to 20% of all complaints filed. *See* Association of the Bar of the City of New York, *Report on the Grievance System* 26 (1976).

To be sure, we have allowed legislative history to override the literal words of federal statutes that were even "plainer" than the statute at issue here. *See, e.g., Railway Labor Executives' Association v. I.C.C.,* 735 F.2d 691, 700–02 (2 Cir.1984); *J.C. Penney Co. v. C.I.R.,* 312 F.2d 65, 71 (2 Cir.1962). But in those cases the history clearly showed that the legislature could not have meant what it literally said. Here we find nothing in the legislative history or in the structure and purpose of the statute which assures us that the legislature, though it used the broad phrase "an attorney at law," really meant "an attorney at law authorized to engage in the practice of law in this state"—especially not when the legislature placed a functionally corresponding qualifier on the words "real estate broker." Material *dehors* the language of the statute is legitimately relied upon when it shows with a fair degree of certainty that an interpretation other than that following more naturally from the letter accords better with the purpose of the

legislature, but not when such material merely creates a doubt. It may indeed be that the legislature intended to limit the "attorney at law" exemption to attorneys licensed by New York. But there are no indications of this having sufficient clarity for us to narrow what the legislature said. We are dealing with a statute upon whose language people should be able to rely, in the absence of judicial construction, without going beyond its words. While technology may have rendered obsolete some of Justice Jackson's observations in *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 396, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (concurring opinion), as Judge Wald suggests, *see* Wald, *supra*, at 200, there is still merit in the idea that where a person finds himself exempted by the words of a statute and there is no case law to the contrary, he should not have first to cogitate and then to investigate whether the legislature meant what it said. Dow Jones has failed to satisfy us that the New York Court of Appeals would limit the exemption for "an attorney at law" to attorneys admitted to the New York bar.[9]

**9.** By letter dated January 3, 1986, counsel for Dow Jones called our attention to Rule 500.7 of the New York Court of Appeals, adopted on November 20, 1985 and effective January 1, 1986. This provides that when the Supreme Court, a United States Court of Appeals, or a state court of last resort determines there are questions of New York law in a cause pending before it for which there is no controlling precedent in the New York Court of Appeals, such court may certify the dispositive questions of law to the Court of Appeals. That court will then examine the merits presented by the certified question, first to determine whether to accept the certification and, if it decides to do so, what review procedures should be followed. Counsel's letter notes that the present appeal "involves potentially controlling issues of New York law, relating particularly to the reach of that State's statute of frauds" and advises us of the availability of the certification procedure, but does not affirmatively request that we attempt to use it in this case. In view of the stage that our decisional process had reached before the certification procedure became available, the delay that would be involved in our now preparing the certificate required by Rule 500.-17(b), the Court of Appeals' examination of the certificate, and further proceedings in that court, the existence of a question of California choice of law that would have to be faced if the

### 2. *The Fraud Claim*

■ Although we consider the issue with respect to Lehman's fraud claim to be somewhat more difficult than did the district judge, in the end we agree with the grant of summary judgment to Dow Jones.[10]

In the first place, we must consider what state's law governs the fraud claim. Although Lehman does not concede that New York law would apply, he, like Dow Jones, cites only New York cases. Under these circumstances we do not feel obliged to undertake an investigation to determine whether there is any difference in the California law and what law a California court would apply if there were.

The district judge correctly stated that "New York courts have made it clear that a plaintiff may not circumvent the Statute of Frauds, as Lehman has attempted here, by simply recasting his claim for breach of contract as an action for fraud." For this proposition he cited a statement in *Solin Lee Chu v. Ling Sun Chu*, 9 A.D.2d 888,

Court of Appeals should hold the attorney exception to be inapplicable and of questions of New York law that we would not deem proper for certification, we have determined not to seek to avail ourselves of the procedure in this case, happy as we are to have it available in the future. For a discussion of the factors to be considered in determining whether or not to certify, *see* 17 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4248 (1978).

**10.** One may wonder whether the fraud claim continues to have practical significance in light of our reversal of the grant of summary judgment with respect to the "contract-like" claims. If Lehman prevails on the latter, any recovery on the fraud claim would be duplicative. If he fails on the "contract-like" claims because of inability to prove a promise by Dow Jones, he would necessarily lose on the fraud claim; if he fails because of inability to establish that he was a procuring cause of Dow Jones' acquiring an interest in Continental, it is hard to perceive how he could recover on the fraud claim since he would have been paid nothing even if Dow Jones had intended to perform its promise. Still, there may be permutations of which we have not thought; moreover, in view of the conclusion we reach, a ruling on the fraud claim will limit the scope of the trial.

889, 193 N.Y.S.2d 859, 860 (1st Dep't 1959), that

> the plaintiff may not, through the cause of action in fraud, seek to enforce the promises of the defendant made in the agreement which we have held to be unenforceable. Damages which would flow from the breach of the agreement, were it enforceable, may not be recovered here.

Notwithstanding this statement, however, the Appellate Division refused to dismiss the complaint in *Solin Lee Chu*, holding that the plaintiff in a fraud action predicated on a promise made with no intent to perform may nonetheless "recover the direct pecuniary loss, if any, suffered by reason of the wrong." Indeed, the Court of Appeals had previously made this clear in *Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 263, 151 N.E.2d 833, 836 (1958), where Judge Fuld, citing *Sabo v. Delman*, 3 N.Y.2d 155, 159, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906, 907 (1957), stated:

> If the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery, but, on the other hand, one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability *in tort* whether the agreement is enforcible or not. ... The policy of the statute of frauds is "not directed at cases of dishonesty in making" a promise ...; never intended as an instrument to immunize fraudulent conduct, the statute may not be so employed.

We must therefore inquire whether the complaint pleaded the essential elements of an action for fraud distinct from an action for breach of contract and, if so, whether any triable issues of fact survived the papers on Dow Jones' motion for summary judgment.

Under New York law, the essential elements of a fraud claim are "(1) representation of a material existing fact; (2) falsity of the statement; (3) scienter; (4) deception; and (5) injury." *Songbird Jet Ltd. v. Amax Inc.*, 581 F.Supp. 912, 925 (S.D.N.Y. 1984) (footnote omitted), *aff'd by order*, 779 F.2d 39 (2 Cir.1985). Taking these elements in turn, and viewing the complaint with a charitable eye, Lehman has alleged:

(1) Dow Jones represented to Lehman either expressly or impliedly on several occasions its present intention to pay him, at a rate he had proposed, if his efforts to find a suitable company for Dow Jones resulted in an acquisition;

(2) Dow Jones did not actually have such an intention;

(3) Dow Jones knew it had no such intention and acted with the purpose of deceiving Lehman and inducing him to make efforts on its behalf in the expectation of being paid;

(4) Lehman reasonably relied on Dow Jones' representations and thereby "incurred substantial expenses and performed the extensive services" set forth in ¶¶ 10–15 of the complaint; [11] and

(5) as a direct and proximate result of this reliance, Lehman "suffered damages in the amount of $905,000.00."

So read, the fraud count in Lehman's complaint is not "simply a shadow of his contract claims," as Dow Jones contends. Lehman does not claim that the "fraud" consisted of Dow Jones' explicit and implicit representations that it intended to pay him for his services when at the time it in fact did not. New York law is clear that an action for fraud will lie when a defendant makes a promise that he has no present intention of performing. *See Songbird*, 581 F.Supp. at 924 & n. 39; *Channel Master*, 4 N.Y.2d at 406–07, 176 N.Y.S.2d at 262–63, 151 N.E.2d at 835–36; *Sabo*, 3 N.Y.2d at 159–60, 164 N.Y.S.2d at 716–17, 143 N.E.2d at 907–08; *see also Prosser &*

---

**11.** These "extensive services" allegedly consisted of informing Dow Jones by letter and telephone that Continental was available, providing Dow Jones with an analysis of Continental's attractiveness, and offering to arrange a meeting between representatives of Dow Jones and senior officers of Continental.

*Keeton on The Law of Torts* § 109, at 763 (5th ed. 1984) (New York follows majority rule) [hereafter *"Prosser"*]; 3 *Restatement (Second) of Torts* § 530(1) (1977).

·When the record is viewed in the light most favorable to Lehman, as it must be, it appears that he has adduced facts sufficient to raise triable issues with respect to the first four elements of his fraud claim. *Cf. Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 884, 411 N.Y.S.2d 669, 672 (2d Dep't 1978) (upholding fraud claim by purported finder on similar facts). But the fifth element—injury—is wanting. Under New York law, Lehman must show that he was injured as a direct and proximate result of his reliance on Dow Jones' misrepresentations. *See Dress Shirt Sales, Inc. v. Hotel Martinique Associates*, 12 N.Y.2d 339, 343, 239 N.Y.S.2d 660, 663, 190 N.E.2d 10, 12 (1963) (plaintiff must show actual pecuniary loss stemming from the fraud); *Reno v. Bull*, 226 N.Y. 546, 552–53, 124 N.E. 144, 146 (1919); *see also Prosser, supra*, § 110, at 767–68 (New York follows minority rule allowing recovery in fraud of only "out-of-pocket" losses). Thus, Lehman "must show injury other than that resulting from ... [Dow Jones'] refusal to pay a finder's fee." *Philo Smith & Co. v. USLIFE Corp.*, 420 F.Supp. 1266, 1274 (S.D.N.Y.1976) (applying New York law), *aff'd*, 554 F.2d 34 (2 Cir.1977).

On the record before us, Lehman has not adduced facts sufficient to establish the element of injury. His request for $905,-000.00, which is what he would have been paid under the alleged oral agreement, is clearly an attempt to recoup his "loss-of-benefit" or contract damages. While a plaintiff is not held to the *ad damnum*

pleaded in the complaint, F.R.Civ.P. 54(c); *see, e.g., Riggs, Ferris & Geer v. Lillibridge*, 316 F.2d 60, 62 (2 Cir.1963), here there is no evidence to suggest that Lehman has suffered actual pecuniary loss in any amount. Lehman alleges that he performed a number of services in reliance on Dow Jones' misrepresentations, *see supra* note 11, but he has not demonstrated how the alleged fraud *itself* caused him to do any of these things. Performing such services was his business. There is no reason to believe that in the absence of Dow Jones' alleged misrepresentations, Lehman would not still have followed Continental, analyzed its attractiveness, and sent out letters containing his conclusions, as he did here to four other companies not alleged to have made any promises—in short, that he would not have done all of the things he did anyway. Thus, the only injury Lehman can claim from the alleged fraud is the incremental effort, including postage and telephone calls, to which he was put as a result of adding Dow Jones to his list of potential clients on the Continental deal. Aside from a vague allegation that he "incurred substantial expenses" in providing Dow Jones with services related to the Continental deal, Lehman has neither claimed a specific injury flowing from his reliance on Dow Jones' alleged misrepresentations nor adduced facts sufficient to permit an inference of such an injury.[12] The district court was thus correct in granting summary judgment to Dow Jones on the fraud claim.

### 3. *The Breach of Confidence Claim*

We come finally to Lehman's claim that he provided Dow Jones with "non-public

---

**12.** Lehman cites *Shapiro v. Dictaphone Corp.*, 66 A.D.2d 882, 411 N.Y.S.2d 669 (2d Dep't 1978), as a case in which a New York court deemed sufficient on the element of injury an allegation by the purported finder that he had brought the acquired company's name to the defendant's attention and had performed other services in connection with the acquisition and, as a result of the defendant's refusal to pay, had been damaged in the amount, $300,000.00, that he would have received under the alleged finder's contract. The case is distinguishable, however. There is no indication that the finder in *Shapiro*

submitted the acquired company's name to any of his other clients; therefore, it was entirely reasonable to assume that he gave up whatever fee he might have gotten from one of them in reliance on getting a fee from the defendant. Here, Lehman submitted Continental's name to his other clients and none displayed any interest. Moreover, the finder in *Shapiro* alleged much greater efforts on behalf of the defendant, including participating in the acquisition all the way to completion, than Lehman has alleged with respect to Dow Jones.

information," which Dow Jones accepted "in confidence with the understanding that it was not to be disclosed to others or used beyond the limits of the confidence" without Lehman's permission, but which Dow Jones subsequently disclosed or used to Lehman's detriment.[13] This information, conveyed in letters and over the telephone, supposedly consisted of (1) the receptivity of Continental's principal officers to meet with prospective merger partners, despite Continental's publicly announced registration (the "availability information"); and (2) non-public analyses of opportunities available to Dow Jones, in particular Lehman's advice that Continental represented a better opportunity than other transactions Dow Jones had considered, including the transaction with Falcon (the "attractiveness information").

Lehman has styled this claim "breach of confidence" without explaining which of the several theories of recovery encompassed by those words he relies upon. The district judge apparently treated the claim as one for unlawful use of trade secrets and granted summary judgment to Dow Jones on the ground that Lehman had failed to show that the availability and attractiveness information was a trade secret or had been adequately protected as such.[14] Lehman's principal contention here, how-

ever, is not that the availability and attractiveness information was a trade secret, but that it was "confidential" and was disclosed in circumstances that placed Dow Jones under a duty not to use it without making payment.[15]

■ The district judge was clearly correct in holding that neither the availability nor the attractiveness information constituted a trade secret. The most comprehensive and influential definition of a trade secret is that set out in § 757, comment b of the *Restatement of Torts* (1939) [hereafter *Restatement*]; [16]

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business ... in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract

---

**13.** In contrast to the fraud claim, *see supra* note 10, this claim clearly would retain vitality even if Lehman should lose with respect to the "contract-like" claims.

**14.** The district judge cited *Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dep't 1982), and *Rototron Corp. v. Lake Shore Burial Vault Co.,* 553 F.Supp. 691 (E.D. Wis.1982) (applying New York law), *aff'd,* 712 F.2d 1214 (7 Cir.1983), both cases involving industrial trade secrets.

**15.** The parties disagree whether New York or California law applies to the breach of confidence claim. Although California law is more favorable to Lehman, we conclude that the claim would fail whether New York or California law applies.

**16.** The *Restatement (Second) of Torts* does not address the subject of trade secrets. The introductory note to Division Nine explains:

The rules relating to liability for harm caused by unfair trade practices developed doctrinally from established principles in the law of

Torts, and for this reason the decision was made that it was appropriate to include these legal areas in the Restatement of Torts, despite the fact that the fields of Unfair Competition and Trade Regulation were rapidly developing into independent bodies of law with diminishing reliance upon the traditional principles of Tort law. In the more than 40 years since that decision was initially made, the influence of Tort law has continued to decrease, so that it is now largely of historical interest and the law of Unfair Competition and Trade Trade Regulation is no more dependent upon Tort law than it is on many other general fields of the law and upon broad statutory developments, particularly at the federal level. The Council formally reached the decision that these chapters no longer belong in the Restatement of Torts, and they are omitted from this Second Restatement.

4 *Restatement (Second) of Torts,* at 1–2 (1979).

or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

*See Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 803, 453 N.Y.S.2d 470, 472 (1982); *Cal Francisco Investment Corp. v. Vrionis*, 14 Cal.App.3d 318, 322, 92 Cal. Rptr. 201, 204 (1971); 1 Milgrim, *Milgrim on Trade Secrets* § 2.01, at 2–3 n. 2 (1985) [hereafter *"Millgrim"*]; *see also Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 222 n. 2 (2 Cir.1971) (in the broad sense, a trade secret is "any unpatented idea which may be used for industrial or commercial purposes"). Although the bulk of trade secret law relates to industrial information, some kinds of non-industrial business information—for example, data related to customers, merchandising, cost and pricing, and systems and methods—are also protected. *See* 1 *Milgrim, supra,* § 2.09[8]. Of relevance here is the protection sometimes given information concerning business opportunities, like knowledge of a valuable mineral discovery, a brokerage opportunity, or an impending transaction. *See id.* § 2.09[8][f].

The availability and attractiveness information at issue here does not fall within even the broadest definition of a trade secret. Assuming for purposes of discussion that the relevant "business" engaged in by Lehman was the finding of corporate acquisition deals, we find it impossible to characterize the availability and attractiveness information as "a process or device for continuous use in the operation of the business" as required by the *Restatement* definition. If anything, it partook of what that definition calls "information as to single or ephemeral events in the conduct of the business," which is not protected as a trade secret. This is not to say that a business like Lehman's will never possess information that qualifies as a trade secret. If the requisite elements of secrecy were proved, one could imagine that a manual on how to set up acquisition deals, a list of contacts, or even model letters and forms might so qualify. Information like this would be used in *running* the business; to draw an industrial analogy, it would be like the formulas or processes used in manufacturing. In contrast, the information at issue here was not used to run Lehman's business but was its *product:* like the car that rolls off the production line, this information was what Lehman had to sell.

Moreover, even if the availability and attractiveness information might qualify as a trade secret, we would agree with the district judge that Lehman has not shown that it did so in this case. While the courts, citing the *Restatement,* list a series of factors relevant to determining whether particular information is a trade secret, *see, e.g., Speedry Chemical Products, Inc. v. Carter's Ink Co.,* 306 F.2d 328, 331 (2 Cir.1962); *Eagle Comtronics,* 89 A.D.2d at 803–04, 453 N.Y.S.2d at 472, the most important consideration remains whether the information was secret. *See* 1 *Milgrim, supra,* § 2.03. Secrecy is a question of fact. *K–2 Ski Co. v. Head Ski Co.,* 506 F.2d 471, 474 (9 Cir.1974); *Nickelson v. General Motors Corp.,* 361 F.2d 196, 199 (7 Cir.1966).

The district judge concluded that the availability and attractiveness information was not secret because it was "a matter of public knowledge" and because Lehman had "disseminated the same information he gave to Dow Jones to at least four other companies at the same time." The former was clearly the case with respect to the availability information—if not when Lehman first gave the information to Dow Jones, certainly by the time Dow Jones allegedly used it. Indeed, Lehman main-

tains that Continental itself told Hellman about its willingness to enter into merger discussions and that Hellman told Weigers, who brought Dow Jones into the deal. This demonstrates why the availability information could never have been a trade secret: Lehman had no control over its disclosure. *See* 1 *Milgrim, supra*, § 2.04, at 2–36 ("[T]he courts require that the possessor of a trade secret take reasonable measures to protect its secrecy."). Since Continental was under no obligation not to disclose its availability for merger discussions, Lehman was never in a position to protect the alleged secrecy of the information as the law requires. In view of this, we need not consider whether Lehman's dissemination of the attractiveness information to other clients was conduct inconsistent with protecting it as a trade secret even though most of these disclosures were also made in confidence.

On the other hand, the district judge appears to have erred in characterizing the attractiveness information as public knowledge. Lehman alleges that his analysis, though perhaps based largely on public sources, reached conclusions that were specially tailored to Dow Jones' situation and that incorporated his earlier research on Falcon. Dow Jones concedes that Lehman's "advice" regarding the attractiveness of Continental was not a matter of public knowledge. Likewise, the record as to the attractiveness information does not support the district judge's conclusion that Lehman "disseminated the same information he gave to Dow Jones to at least four other companies at the same time." Although Lehman's opinion about the attractiveness of Continental in general appeared in his letters to the other companies, his particular advice regarding Dow Jones' situation would have been useless to them, and the record shows that it was divulged to Dow Jones alone. But even if these factors lend credence to Lehman's claim that the attractiveness information was secret, they do not detract from the point made earlier: Lehman's opinion about Continental's attractiveness to Dow Jones is simply not the kind of information that qualifies as a *trade* secret.

However, this does not end our inquiry. A cause of action may arise with respect to information that does not qualify as a trade secret if the information is disclosed in confidence and later used in a manner that breaches the confidence. *See Rototron Corp. v. Lake Shore Burial Vault Co.*, 553 F.Supp. 691, 697–98 (E.D.Wis.1982) (applying New York law), *aff'd*, 712 F.2d 1214 (7 Cir.1983); *Vantage Point, Inc. v. Parker Brothers, Inc.*, 529 F.Supp. 1204, 1216–18 (E.D.N.Y.1981), *aff'd sub nom. Vantage Point, Inc. v. Milton Bradley Co.*, 697 F.2d 301 (2 Cir.1982); *De Filippis v. Chrysler Corp.*, 53 F.Supp. 977, 980–81 (S.D.N.Y. 1944), *aff'd*, 159 F.2d 478 (2 Cir.), *cert. denied*, 331 U.S. 848, 67 S.Ct. 1733, 91 L.Ed. 1857 (1947); *Downey v. General Foods Corp.*, 31 N.Y.2d 56, 61–62, 334 N.Y. S.2d 874, 877–78, 286 N.E.2d 257, 259–60 (1972); *Desny v. Wilder*, 46 Cal.2d 715, 299 P.2d 257, 265–71 (1956); *Faris v. Enberg*, 97 Cal.App.3d 309, 158 Cal.Rptr. 704 (1979). Claims of this sort are often discussed under the rubric "submission of ideas." Contrary to Dow Jones' argument in its brief, the various theories that have been developed in this area are not restricted to literary ideas. *See, e.g., Krisel v. Duran*, 258 F.Supp. 845 (S.D.N.Y.1966) (Weinfeld, J.) (idea for construction of petrochemical complex and plan to modify oil import quota restrictions), *aff'd*, 386 F.2d 179 (2 Cir. 1967), *cert. denied*, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968); *De Filippis, supra* (idea for an automatic automobile transmission); *Downey, supra* (idea for name and advertising strategy for jello). However, Lehman still has the burden of showing that the availability and attractiveness information consists of the kind of "ideas" that merit protection under the doctrine.

Lacking any allegation or proof by Lehman that the availability and attractiveness information was protected by an express confidentiality agreement, *see* 3 Nimmer, *Nimmer on Copyright* § 16.04 (1985) [hereafter *"Nimmer"*], as distinguished from his unilateral proclamation, or that he disclosed the information in the context of a "confidential relationship" with Dow Jones, *see, e.g., Whitfield v. Lear*, 582

F.Supp. 1186, 1190 n. 3 (E.D.N.Y.) (applying California law), *rev'd on other grounds*, 751 F.2d 90 (2 Cir.1984); *Sachs v. Cluett Peabody & Co.*, 265 App.Div. 497, 500, 39 N.Y.S.2d 853, 856 (1st Dep't 1943), *aff'd*, 291 N.Y. 772, 53 N.E.2d 241 (1944); 3 *Nimmer, supra,* § 16.06, the only claim left open to him is that he disclosed the information in circumstances that gave rise to an implied-in-fact contract that Dow Jones would not use the information without paying him. California has gone quite far in finding implied-in-fact contracts where "under all circumstances attending disclosure it can be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered." *Faris,* 97 Cal.App.3d at 318, 158 Cal.Rptr. at 709; *see Desny,* 46 Cal.2d at 739, 299 P.2d at 270; 3 *Nimmer, supra,* § 16.05[C]; *cf. Whitfield,* 582 F.Supp. at 1190 n. 4 (California cases should be restricted to their special facts); *Smith v. Weinstein,* 578 F.Supp. 1297, 1305 (S.D.N.Y.) (minimum requirement under California law is that recipient of the idea "said something to indicate an agreement to pay"), *aff'd,* 738 F.2d 419 (2 Cir.1984). Lehman claims that his affidavit alleges an implied agreement on the part of Dow Jones to pay for use of the information sufficient to create a triable issue of fact, at least if California law applies.

Fatal to such a claim, however, is the nature of the "ideas" that Lehman alleges were the subject of the confidentiality understanding. New York law implies a requirement that "when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent." *Downey,* 31 N.Y.2d at 61, 334 N.Y.S.2d at 877; *see Ferber v. Sterndent Corp.,* 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980). Even if the availability and attractiveness information consisted of the kind of "ideas" protectible under a breach of confidence theory, the ideas were neither novel nor original. Thus, Lehman's claim fails under New York law. California law does not impose a requirement of novelty or originality where information is allegedly the subject of an implied-in-fact contract of confidentiality. *See Faris,* 97 Cal.App.3d at 317–18, 158 Cal.Rptr. at 708–09. Nonetheless, Lehman has cited no California cases predicating liability for breach of confidence on disclosure or use of the kind of information at issue here, and our research has not discovered any. To paraphrase Judge Sofaer's conclusion in *Smith v. Weinstein,* 578 F.Supp. at 1306, we would be unwilling to extend protection under California law to ideas as "mundane" as those represented by the availability and attractiveness information without some indication from the California courts that they are willing to stretch the theory of breach of confidence to such extreme lengths, even if we should regard California law as applicable.

Insofar as the district court granted summary judgment on the "contract-like" claims, the judgment is reversed and the cause is remanded for further proceedings consistent with this opinion. Insofar as the district court granted summary judgment with respect to the fraud and breach of confidence claims, the judgment is affirmed. No costs.