**Brad M. REISS, Plaintiff,**

v.

**GAN S.A., Société Centrale du Groupe des Assurances Nationales a/k/a Société Centrale du Gan n/k/a Société de Gestion de Garanties et de Participations, Union Pour le Financement D'Immeubles de Societes, and Union Industrielle de Credit, Defendants.**

**No. 98 Civ. 8302(SAS).**

United States District Court,
S.D. New York.

July 29, 1999.

Richard E. Haftel, Modlin Haftel & Nathan LLP, New York, NY, for Plaintiff.

Fredrick E. Sherman, Jones, Day, Reavis & Pogue, New York, NY, for Defendants UIS and UIC.

Frederick T. Davis, Laurie R. Blank, Shearman & Sterling, New York, NY, for Defendant Gan S.A.

Lawrence W. Newman, Baker & McKenzie, New York, NY, for Defendant Société.

## OPINION and ORDER

SCHEINDLIN, District Judge.

This is an action to recover a finder's fee to which plaintiff Brad M. Reiss ("Reiss") claims he is entitled for having successfully interested General Electric Capital Corporation ("GECC") in acquiring two French real estate companies, Union Pour le Financement D'Immeubles de Sociétés ("UIS") and Union Industrielle de Credit ("UIC"). Reiss claims that he entered into an oral contract with Alain Juliard ("Juliard"), the Chairperson of UIS, to find a buyer for UIS and UIC in exchange for

a commission of 1% of the value of the transaction. The Amended Complaint ("Cmplt.") pleads causes of action in breach of contract and quantum meruit. Defendants UIS, UIC, Société Centrale du GAN, now known as Société de Gestion de Garanties et de Participations ("Société") and GAN S.A. ("GAN S.A.") bring motions to dismiss, arguing that any oral contract for a broker or finder's fee in this situation is barred by New York's Statute of Frauds. Additionally, UIC, Société and GAN S.A. assert that this Court lacks personal jurisdiction over them and that Reiss has failed to state a claim upon which relief can be granted.

## I. Factual Background

### A. Parties

Reiss is currently—and has been since at least 1990—a licensed real estate broker who has been engaged in the commercial real estate business for more than fifteen years. *See* Cmplt. at ¶ 8; Certificate of State of New York, Department of State certifying Reiss' status as individual broker, attached as Exh. B to Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss of Defendant UIS ("Pl's UIS Opp."). From 1989 to 1993, he was associated with the firm Sonnenblick–Goldman. *See* Cmplt. at ¶ 21.

All of the defendants are corporations organized under the laws of France.[1] UIS acquires commercial and industrial real estate for lease back to other companies, and it is an approved SICOMI (a company specializing in real estate investment for business and industry) pursuant to French law. *See id.* at ¶ 12. UIC, at the times relevant to this dispute, was a financial institution that held a substantial real estate portfolio. *See id.* at ¶ 14. Société is wholly owned by the government of France. *See* Memorandum of Law in Support of the Motion to Dismiss of Defendant Société ("Société Mem.") at 2. GAN S.A., a holding company, is currently the parent of a group of French companies involved in the insurance business. *See* Exhibit A to Memorandum of Law in Support of Motion to Dismiss GAN S.A. ("GAN S.A. Mem.").

In 1992, the year that the alleged oral contract was formed, GAN S.A. was a wholly owned subsidiary of Société. *See* Cmplt. at ¶ 4. GAN S.A., in turn, wholly owned UIC. *See id.* GAN S.A. also owned 94.47% of UIS—4.47% directly, 47.30% through UIC and 47.17% through other affiliates. *See id.*[2] In 1997, prior to the sale of UIC and UIS to GECC, GAN S.A.'s shares of UIC were transferred to Société. *See* Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss of GAN S.A. ("Pl's GAN S.A. Opp.") at 11 n. 8.

UIS, together with FINABAIL, another company owned by GAN S.A., and two other companies—all of which were involved in real estate—were collectively known as Groupe Percier. *See* Cmplt. at ¶ 4.

### B. Reiss' Involvement in Sale of UIS and UIC

For purposes of this motion, the following facts, drawn from the Amended Complaint, are assumed to be true. Reiss has had an almost twenty-year personal and professional relationship with Alain Juliard, the Chairperson of UIS. *See id.* at ¶ 19. In or about April 1992, Reiss, on behalf of his firm's client United States Surgical Corporation ("USSC"), arranged for UIS to provide approximately 483,910,000 French francs in financing to USSC for its European headquarters and distribution and training facility near Paris. *See id.* at ¶¶ 26–28. During the transaction, Reiss told Juliard that his firm, Son-

---

1. Since plaintiff is a New York citizen and all defendants are French corporations, and the amount in controversy exceeds $75,000, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2. It is unclear whether defendants dispute the accuracy of Reiss' description of this corporate structure as it existed in 1992.

nenblick–Goldman, expected to receive from USSC a 1% fee—its customary arrangement—for its work in that kind of transaction. *See id.* at ¶ 27. At the close of the transaction, Reiss sent a copy of Sonnenblick–Goldman's bill to Juliard, who assisted him in collecting the fee from USSC. *See id.* at ¶¶ 28–29.

In or about July 28 or 29, 1992, Juliard visited New York in connection with the USSC transaction. As Juliard, Reiss, and UIS' Financial Director, Philippe Rosio ("Rosio"), rode back from a meeting, Juliard advised Reiss that "GAN"[3] had authorized Juliard to explore opportunities to reduce GAN's real estate holdings in France, including GAN's position in UIS and/or FINABAIL. *See id.* at ¶ 33. "Prior to this drive, Juliard had repeatedly told Reiss that, before he undertook any actions with respect to any important matters, GAN required him to obtain its approval." *See id.* During the drive, Juliard explained that defendants' goal was to have a United States corporation make a "substantial investment" in UIS and/or FINABAIL. The best way to accomplish this end, defendants believed, was to convince a U.S. company to enter into a joint venture with defendants or make an initial investment in UIS and/or FINABAIL, which would allow the U.S. company to become familiar with GAN's holdings and the French real estate market. *See id.* at ¶ 35. Juliard and Reiss then entered into an oral contract:

> Juliard told Reiss that defendants would like to retain Reiss to find one or more United States corporations to participate in transactions with defendants and/or to acquire an interest in GAN's holdings in UIS and/or FINABAIL.

> The proposed engagement was broad and not limited to any specific transaction or time period or type or source of capital.

Reiss accepted the engagement upon defendants' commitment that, if he succeeded in introducing a company that resulted in any transaction with defendants, defendants would pay his fee of 1% on any large transaction, like the USSC deal, and 2%–3% on any smaller transaction.

Juliard agreed that defendants would pay Reiss the foregoing fees for a successful transaction.

*Id.* at ¶¶ 36–39. This agreement was never reduced to writing.

According to Reiss, he subsequently began performing services that ultimately led to GECC's purchasing UIC and UIS. Initially, Reiss contacted Richard Grimaldi ("Grimaldi"), an executive in GECC's Real Estate Division with whom he had a relationship, in an attempt to interest GECC in reentering the French commercial real estate market by participating in transactions with, or acquiring an interest in, Groupe Percier. *See id.* at ¶ 43. Juliard and Rosio, in consultation with Reiss, decided to encourage GECC, as an initial matter, to acquire GAN's shares in FINABAIL, with the hope that such transaction would lead to other deals or a more substantial investment by GECC in Groupe Percier. *See id.* at ¶ 52.

In a subsequent conversation between Grimaldi and Reiss, Grimaldi suggested that Groupe Percier submit a written presentation for him to circulate within GECC. *See id.* at ¶¶ 47–48. Rosio, in consultation with Reiss—who provided multiple comments—prepared a written presentation relating to an investment in FINABAIL by GECC. *See id.* at ¶¶ 53–58. Reiss delivered the presentation to Grimaldi. *See id.* at ¶ 58. He also provided Grimaldi a copy of UIS' annual report he received from Rosio. In addition, around this time Reiss contacted approximately two hundred other U.S. companies that had invested or planned to invest in

---

**3.** In the Amended Complaint, Reiss does not distinguish between GAN S.A. and Société. Rather, he refers to "GAN," which is defined as jointly referring to both GAN S.A. and Société.

France in an attempt to interest them in Groupe Percier's activities. *See id.* at ¶¶ 61–62.

Around July 1993, Reiss joined Allied Partners, Inc., a company formed to manage and invest in real estate. *See id.* at ¶ 66. In September 1993, following Grimaldi's expression of GECC's interest in pursuing a transaction with defendants, Reiss arranged a meeting in New York among himself, Juliard, Rosio, Grimaldi and Richard H. Powers ("Powers"), Managing Director of Commercial Property Financing for GECC in Europe. *See id.* at ¶¶ 75–79. Prior to the meeting, while Juliard, Rosio and Reiss discussed strategy, Juliard informed Reiss that "he had spoken to GAN about UIC, and GAN had communicated to Juliard that GAN wanted Juliard, on behalf of GAN and UIC, to seek to interest GECC in the acquisition of part or all of UIC," either for its own business or as a means to acquiring UIS. *Id.* at ¶ 78. "Juliard then explained that GAN would be extremely pleased with any GECC interest in any part of UIC, and asked Reiss, pursuant to Reiss' engagement, to help UIC, GAN, and Juliard stimulate GECC's interest in an acquisition in UIC as well as UIS." *Id.* At the meeting, Rosio and Juliard pitched to GECC the prospect of acquiring an interest in UIS and FINABAIL, possibly through the acquisition of an interest in UIC. *See id.* at ¶ 80.

A few months later, Reiss and Juliard agreed that Reiss, in representing Groupe Percier's interests, would operate under the joint name "Groupe Percier–Allied Partners," which listed its address as Reiss' office in New York. Prior to agreeing to this arrangement, Juliard and Rosio had informed Reiss that they had obtained the required approval from GAN in order to proceed in this manner. *See id.* at ¶¶ 67–72. Shortly thereafter, Juliard informed Reiss that GAN had authorized Reiss to open a bank account in the name of Group Percier–Allied Partners in New York, which Reiss subsequently opened at Chase Manhattan Bank. *See id.* at ¶ 73.

Between October 1993 and March 1994, defendants and GECC had periodic discussions by telephone and at meetings in Europe regarding a potential GECC acquisition of UIC and/or UIS stock. *See id.* at ¶ 83. Juliard and Rosio kept Reiss apprised of these dealings, sending him copies of correspondence between Groupe Percier and GECC. *See id.* at ¶¶ 82–87. In April 1994, GECC executed confidentiality letters relating to information about UIS and UIC, which had been approved by GAN. *See id.* at ¶¶ 88–93. During this time, Juliard and Rosio also instructed Reiss to continue soliciting other potential investors and provided him with UIS dividend information. *See id.* at ¶ 94.

On June 1, 1994, at the request of Rosio, Reiss attended a meeting in New York among Michael Fraizer, a senior officer of GECC's Real Estate Division, Juliard and Rosio. *See id.* at ¶¶ 95–98. On September 13, 1994, Reiss attended a meeting at the Hotel Vernet in Paris (the "Hotel Vernet Meeting") among Fraizer, Powers, Juliard, Rosio and Guy de Chavanne, the Director General of GAN S.A. and Director General of Société. At this meeting, GECC's potential investment in UIS and UIC was discussed. *See* Cmplt. at ¶¶ 107–110. Juliard, Rosio and Arline Gaujal, a director of UIS, met with Reiss in New York in October 1994 to discuss, among other things, matters involving GECC. *See id.* at ¶¶ 112–13.

Juliard and Rosio also sought assistance from Reiss in other transactions with GECC. In contemplation of a potential joint GECC/Groupe Percier investment in Silic, a real estate investment company, Reiss accompanied GECC representatives to Paris in July 1994. Rosio encouraged Reiss to use this opportunity to "present to [GECC] the real estate assets of [UIC]." *See id.* at ¶¶ 101–104; Exh. 37 [4] (letter from Rosio to Reiss dated June 30,

4. Citations to "Exh. ___" refer to the exhibits appended to the Amended Complaint.

1994). Reiss also accompanied Grimaldi and Powers to Paris in September 1995, at defendants' request and as UIS' representative, to review documents related to a potential acquisition by GECC of a portfolio of property and loans owned by Barclays Bank. *See id.* at ¶ 117. In the fall of 1995, Reiss, in conjunction with Rosio, also aided GECC in the preparation of a study of the French real estate market. *See id.* at ¶ 118.

Reiss also continued to speak frequently with Grimaldi, attempting to maintain GECC's interest in the UIS and UIC transactions, and to speak regularly with Juliard and Rosio. *See id.* at ¶¶ 123, 129–30, 132. According to Reiss, from 1993 to February 1997, he "devoted a substantial portion of his time to promoting defendants' interests and represented no other clients." *Id.* at ¶ 131.

In mid–1996, as it appeared increasingly likely to Reiss and Juliard that GEEC would acquire an interest in UIS and/or UIC, Reiss arranged for Juliard and Rosio to meet with legal counsel in New York. *See id.* at ¶¶ 124–25. On or about July 25, 1996, while Juliard and Rosio were in New York, "Rosio acknowledged that Reiss would be entitled to his fee when the deal was accomplished." *See id.* at ¶ 126.

In February 1997, GAN publicly announced a restructuring plan that included selling its interest in UIS and UIC; this plan was approved in July 1997. *See id.* at ¶¶ 133–34. Pursuant to the requirements of French law, GAN retained Lazard Freres as a financial advisor to make information relating to UIS and UIC available for inspection and to solicit bids for the sale of the companies. *See id.*

Starting in July 1997, at Juliard's request, Reiss contacted other potential investors, and was successful in generating interest in the Blackstone Group, an investment firm. *See id.* at ¶ 136. Blackstone sought reassurance from Reiss that any fee arising from the transaction would be paid by defendants. Thus, on September 17, 1997, Reiss wrote to Juliard and Rosio to confirm that Reiss would be entitled to his fee of 1% if UIS entered into a deal with Blackstone. *See id.* "Although Rosio initially attempted to shift responsibility for payment of Reiss's 1% fee to Blackstone, at no time did Juliard or Rosio ever object to the amount of the fee or Reiss's entitlement thereto. Shortly thereafter, Rosio and Juliard agreed that because, as Reiss noted, he had 'always represented UIS for the past 4 years,' defendants, not Blackstone, were responsible for Reiss's fee." *Id.* at ¶ 137.

In late 1997, Grimaldi informed Reiss that GECC had agreed to acquire UIS. "In an attempt to be paid expeditiously and without an adversarial process," Reiss sent an invoice, dated January 7, 1998, addressed to Juliard, Rosio, Powers, and Ronald Pressman, President of Commercial Real Estate at GECC, for $1 million, a "substantially discounted amount." At that time, Reiss was not aware of the amount of the UIS transaction or the fact that GECC was acquiring an interest in UIC in addition to UIS. *See id.* at ¶ 141. In response to the invoice, Juliard conceded that Reiss had introduced him and Rosio to Powers in 1993 and that out of courtesy, they had kept Reiss informed of their relationship with GECC. He asserted, however, that Reiss' involvement was "essentially limited just to that introduction" and denied that Reiss was owed any fee in connection with the GECC/UIS transaction. *See id.* at ¶ 143; Ex. 60 (letter from Juliard to Reiss dated January 20, 1998).

On or about May 29, 1998, GECC acquired GAN's shares in UIS for approximately $750 million. On or about June 15, 1998, GEEC, in a joint venture with Goldman Sachs/Whitehall Partners, acquired UIC in a deal valued at approximately $350 million. *See id.* at ¶ 145. Reiss has received no fee in connection with either of these transactions.

## II. Discussion

### A. Statute of Frauds

Defendants argue that because Reiss has no written contract, the Statute of

Frauds bars all of his claims. The New York Statute of Frauds provides that

> (a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking: ...
>
> \* \* \* \* \* \*
>
> 10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation *but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law or a duly licensed real estate broker or real estate salesman.*

N.Y. Gen. Oblig. Law ("GOL") § 5–701(a) (emphasis added).

This statute is based upon the concern that business finders and brokers can easily assert false or exaggerated claims for entitlement to commissions in connection with the sale of a business or the brokering of a business opportunity. *See Freedman v. Chemical Const. Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 181, 372 N.E.2d 12 (1977).

> The nature of the transactions is such that, in the absence of a requirement of a writing, unfounded and multiple claims for commissions are frequently asserted, and employers often seek to escape liability by denying the fact of employ-

ment. These controversies are commonly resolved by juries on conflicting testimony, with the consequent danger of erroneous verdicts.

*Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 826, 248 N.E.2d 576 (1969).

Reiss does not dispute that the alleged contract at issue falls within the scope of the Statute of Frauds. The parties disagree, however, as to whether Reiss qualifies for one of the statute's enumerated exceptions. Reiss argues that because he is a real estate broker duly licensed by the State of New York, he has a complete exemption from the statute's requirements. Defendants, by contrast, argue that the exemption for licensed real estate brokers only applies when the broker is engaged in a real estate transaction. Because the transaction at issue in this case was the sale of an entire business (which is engaged in the real estate market), the exemption does not apply and a writing evidencing the contract is required.

### 1. Case law applying the real estate exemption

The only cases that have squarely addressed the New York real estate agent exemption have held that it applies in the context of non-real estate business transactions. *See Fidelity Business Brokers, Inc. v. Gamaldi*, 190 A.D.2d 709, 593 N.Y.S.2d 315 (2d Dep't 1993); *Koontz v. Astronics Corp.*, 108 Misc.2d 1049, 439 N.Y.S.2d 274 (Sup.1981); *Bin–Nun v. Instrument Systems Corp.*, Clerk's No. 20080/70, Slip. op. (Sup.Ct.Co. October 20, 1972), *aff'd*, 41 A.D.2d 733, 342 N.Y.S.2d 367 (1973).[5] In *Bin–Nun*, plaintiff, a licensed real estate broker, sought recovery of a finder's fee under an alleged oral contract for having brought together the parties to the acquisition of a wooden moldings corporation. In moving to dismiss the action on the ground that the agreement was barred by the Statute of

---

**5.** The trial court's decision is an unpublished opinion. It was affirmed in a summary order by five justices of the Appellate Division, First Department.

Frauds, defendant contended that the real estate exemption "was limited and was intended to apply only to transactions involving real estate and therefore the exemption should not apply to any other type of business transaction negotiated or conducted by plaintiff." *Bin–Nun,* Slip op. at 6.

The court rejected defendant's argument, citing to the legislative history in support of a broad interpretation of the exemption.

> The Amendment [containing subdivision (a)(10) of the Statute of Frauds] was recommended by the Law Revision Commission which said the purpose of the amendment was to provide that contracts or agreements for the compensation of business brokers must be evidenced by a memorandum in writing and signed by the party to be charged. (1949 Law Revision Commission Report, Recommendations and Studies, Leg. Doc. No. 65(G)[] ].
>
> The Commission, however, did recognize that under Article 12–A of the Real Property Law, real estate brokers are not only required to be licensed, but are subjected to a comprehensive regulatory statute. The real estate broker is a member of a licensed calling and is subject to discipline and supervision. Hence, unethical conduct can be investigated and punished by the administrative body which supervises the licensing of real estate brokers. The Commission also felt that business brokers are often closely related to real estate brokers, since the sale of a business commonly involves the transfer of a lease or other interest in real property.
>
> While the Commission did not advocate the licensing of business brokers, it did feel that since auctioneers, attorneys and licensed real estate brokers were licensed and accountable to some regulatory body, they should be exempt from the provisions of section 10.

*Id.* at 6–7. The court also held that because the language of the exemption is "broadly written," there should be no implied limitation to real estate transactions. Finally, the court cited to the broad construction that New York courts had placed on the attorney exemption—which applies even if no attorney-client relationship existed between the parties and even if the parties were unaware that the broker was an attorney—and found that "[n]o distinction between attorneys and licensed real estate brokers is made by Section 10." *Id.* at 8; *see also Fidelity Business Brokers,* 593 N.Y.S.2d at 315 (upholding lower court's holding that contract for real estate and business broker's commission in connection with sale of grocery store and real property need not be in writing since plaintiff was licensed real estate broker and was thus exempt from the Statute of Frauds).

*Koontz* involved the issue of whether a broker to a business transaction who is a licensed real estate *salesman,* but is not also a licensed real estate broker, is subject to subdivision (a)(10) of the Statute of Frauds. Relying upon *Bin–Nun,* the court accepted that "a licensed broker may ... enforce a verbal agreement to pay a finder's fee or sale commission earned in connection with a non-real estate business transaction." *Koontz,* 439 N.Y.S.2d at 277. It held, however, that a narrower exception applies to salesmen, emphasizing the different licensing schemes applicable to brokers and salesmen. The court noted that real estate brokers are "already subject to established customs of the real estate industry [and a] comprehensive licensing and regulatory scheme," *id.* at 278, and pointed out that when the Statute of Frauds was passed, a real estate salesman's license "was retained at all times in the custody and control of his broker and was expressly conditioned upon the continuing existence of that employer-employee relationship," *id.* at 277. Thus, the court found, the exemption to the statute should apply to a real estate salesman "only in those situations where he [is] acting in his licensed capacity, that is, as an

employee or associate of his licensed broker." *Id.* at 278; *see also* 61 N.Y. Jur.2d, Statute of Frauds § 14 (1987) (citing *Koontz* for proposition that "the exemption accorded licensed real estate brokers and real estate salesmen is not limited to agreements made in connection with real estate transactions, and a licensed broker may therefore enforce a verbal agreement to pay a finder's fee or sales commission earned in connection with a non-real estate business transaction").

### 2. Legislative History

#### a. Proposed Amendment of the Personal Property Law

In 1949, the New York Law Revision Commission proposed an amendment to the Statute of Frauds, then § 31 of the Personal Property Law. *See* N.Y. Legis. Doc.1949, No. 65(G) ("Commission Report"), attached as Exhibit A to Memorandum of Law in Support of Motion to Dismiss of Defendant UIS ("UIS Mem."). In its Report, the Commission pointed to the prevalence of unfounded commission claims in the context of the sales of businesses and noted that unlike in other states, business brokers in New York were neither regulated nor subject to the Statute of Frauds. In order to remedy the problem, the Commission recommended that the Statute of Frauds be made applicable "to contracts for compensation for services rendered in the sale of a business opportunity, business, or interest therein." *See* Commission Report at 7.

The amendment to the Personal Property Law proposed by the Commission was subsequently adopted by the New York Legislature. It remains virtually unchanged in the current Statute of Frauds, GOL § 5–701(a). The exemption for auctioneers, attorneys at law and real estate brokers and salesmen in the original enactment and the current statute are identical.

#### b. Proposed Amendment of the Real Property Law

The Commission then noted that although real estate brokers are required to be licensed, claims for commissions by real estate brokers also frequently result in disputes. Thus, it believed that "statutory provisions requiring authentication of the fact of employment would be beneficial to the public and to licensed real estate brokers alike." *See* Commission Report at 8. The Commission thus proposed an amendment to the Real Property Law, at Section 1, § 442–i, which would have imposed a writing requirement similar to—although less stringent than—that incorporated in the Personal Property Law. The rationale for requiring a less stringent writing requirement for real estate brokers, as opposed to ordinary business brokers, was that "[t]he real estate broker is a member of a licensed calling, and is subject to discipline and supervision. Hence unethical conduct can be investigated and punished by the administrative supervision which licensing requires." *See id.* Section 442–i thus would have provided that

> Every agreement . . . to pay compensation to a duly licensed real estate broker for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein . . . shall be void, unless it or some note or memorandum identifying the transaction and authorizing or ratifying the rendering of the services to be in writing, and subscribed by the person agreeing to pay such commission or by his lawful agent. . . . This section shall not apply to an agreement to pay compensation to an auctioneer or attorney at law, nor to an agreement by a real estate broker to pay compensation to another real estate broker or to a real estate salesman.

*See id.* at 9. As contemplated by the Commission, the proposed amendment to the Real Property Law was "applicable only to claims made by licensed real estate bro-

kers, and claims by real estate brokers [would] correspondingly [be] excluded from the provisions of the Personal Property Law, section 31." *Id.*

Unlike the amendment to the Personal Property Law, however, the proposed amendment to the Real Property Law did not pass the legislature. "Thus, real estate brokers received a broader exemption from the statute of frauds than the Commission had thought their licensure warranted." *Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 293 (2d Cir.1986) (Friendly, J.) (outlining legislative history in context of construing attorney exemption).

### 3. Analysis

Defendants argue that *Koontz* and *Bin–Nun* are inconsistent: if *Koontz* correctly held that the real estate exemption does not apply to salesmen when they act beyond the scope of their licenses, then *Bin–Nun* must have erred in applying the real estate exemption to real estate brokers engaged in non-real estate transactions, which are beyond the scope of their licenses. They further argue that because there is no decision from the Court of Appeals on this issue and the law applied by the lower courts is "confused and uncertain," this Court is not bound by those lower court decisions. *See Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir.1994) (where law of forum state is uncertain or ambiguous "the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity").

Defendants contend that both the language of the statute and the legislative history reveal that the Court of Appeals would not follow *Bin–Nun. See In re Eastern & Southern Districts Asbestos Litig.,* 772 F.Supp. 1380, 1390 (E.D.N.Y.1991) ("words and language of the statute" are best indication of how the Court of Appeals will construe that statute). Defendants' interpretation turns on what they claim is the express difference in the stat-

ute's treatment of lawyers and auctioneers on the one hand, and real estate brokers and salesmen on the other. According to defendants, the statute categorically exempts auctioneers and attorneys, granting them a "status-based" exemption. Real estate brokers and salesman, in contrast, must be "duly licensed" in order to qualify for the exemption. Defendants contend that "duly licensed" must mean more than that the real estate broker or saleman is "properly" or "sufficiently" licensed; so read, the statute would permit unlicensed attorneys and auctioneers to qualify for the exemption, since the statute does not contain any such qualification for those two classes. Thus, they argue, read in the context of the statute, "duly licensed" must mean that the real estate broker or salesman is "properly or sufficiently licensed to conduct the transaction in question." *See* Memorandum of Law in Support of the Motion to Dismiss of UIS ("UIS Mem.") at 14. In other words, the exemption only applies when the broker or salesman seeks a commission for services he is licensed to perform, namely, services provided in connection with real estate transactions.

■ I find that the Statute of Frauds does not preclude Reiss' claims for a finder's fee. I note first that the New York state case law addressing this issue is not as "confused" as defendants portray it to be. Although the Court of Appeals has not addressed it, all three cases that have looked at this issue have held that the exemption for real estate brokers applies even in the context of the sale of a business. *See In re Eastern and Southern Districts,* 772 F.Supp. at 1390 ("[a]bsent strong evidence that the New York Court of Appeals would decide the issue differently, rulings of the intermediate state appellate courts are particularly persuasive evidence of state law").

Perhaps equally important, the language of the Statute of Frauds exempting real estate brokers is broad and not limited to any particular types of transaction. The only limitation imposed is that the real

estate broker be "duly licensed." Although defendants have presented a creative interpretation of the word "duly," the term merely means that the broker need be properly licensed by the State of New York. As described above, the Commission recommended a less comprehensive writing requirement for real estate brokers because brokers are required to obtain licenses from the New York Secretary of State and are subject to New York's corresponding administrative scheme. Thus, with the Commission relying on the licensure requirement, it follows logically that the statute require that such license be "properly" obtained and/or maintained. *See Lehman,* 783 F.2d at 293 (accepting, in dicta, that the phrase "duly qualified" means that a real estate broker need be authorized as such in the state).

This interpretation is consistent with the Second Circuit's reading of the attorney exemption in *Lehman.* In that case, defendant contended that the Statute of Frauds should only exempt attorneys who are licensed in New York, as opposed to other states, arguing that the rationale for exempting real estate brokers applied with equal force to lawyers—namely, that they are subject to a New York administrative scheme that has the power to discipline them. The court refused to read the provision so broadly, declining to place a qualifier on the language that was not apparent on the face of the statute. Its reasoning is equally applicable here: "[W]here a person finds himself exempted by the words of a statute and there is no case law to the contrary, he should not have first to cogi-

tate and then to investigate whether the legislature meant what it said." *Id.* at 294.

The legislative history of the statute also appears to support this interpretation. The Commission contemplated a two-part scheme for real estate brokers: brokers were "excluded" from the requirements of the Personal Property Law but were simultaneously subjected to a mini statute of frauds, applicable to sales of businesses as well as real estate, in the Real Property Law. With the passage of the amendment to the Personal Property Law—whose exemptions are mirrored exactly in the present statute—but not the Real Property Law, New York was left with a broader exemption for real estate brokers than the Commission had contemplated.[6]

## B. Vagueness

Defendants also argue that the alleged finder's agreement is too vague to be enforced. They contend that plaintiff's allegations are so "amorphous and uncertain" that they fail to provide any benchmark for judging the sufficiency of plaintiff's performance under the contract.[7]

"Before rejecting an agreements as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear . . . . The conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'" *Cobble Hill Nursing Home v. Henry & Warren,* 74 N.Y.2d 475, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203 (1989) (citations omitted).

---

6. Defendants also argue that because Reiss was associated with Sonnenblick–Goldman during the time of the alleged oral agreement, he was acting as a real estate salesman, and thus the reasoning of *Koontz* applies. This argument is unpersuasive: unlike the plaintiff in *Koontz*, during the relevant times of this dispute, Reiss was a licensed real estate broker. The fact that he was working under the name and supervision of another broker does not negate his own license.

7. Defendants rely upon *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981). In that case, a landlord and tenant agreed to renew a lease "at annual rentals to be agreed upon." After the parties failed to agree upon the rental, the tenant sued to compel the landlord to extend the lease for a reasonable sum. The court refused to do so, holding that a "mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."

■ Although not a paradigm of specificity, I do not find that the alleged agreement is sufficiently vague to justify dismissing the Complaint prior to discovery as to the prior course of dealings between the parties and, perhaps, customs and practices in this industry regarding finder's agreements. The Complaint pleads the essential terms: Juliard agreed that in exchange for an introduction that resulted in a transaction with defendants, Reiss would receive a 1% commission. *See Zucker v. Katz*, 708 F.Supp. 525, 532 (S.D.N.Y.1989) (whether "terms are too indefinite to be enforced is an issue better left for summary judgment or trial, at which time the Court can better consider whether the parties meant to make a contract and bind themselves").[8]

### C. Personal Jurisdiction—GAN S.A., Société, UIC

■ Defendants Société, GAN S.A. and UIC ("the "non-UIS" Defendants"), all French entities, move for dismissal based on lack of personal jurisdiction. " 'Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction,' i.e., by making a 'prima facie showing' of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir.1998) (citing *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990)). Plaintiff, however, must ultimately establish jurisdiction by a preponderance of the evidence. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981).

In a diversity case, in determining whether there is personal jurisdiction, the district court must apply the long-arm statute of the forum state. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997). Plaintiff asserts jurisdiction pursuant to CPLR §§ 301 and 302(a)(1). Additionally, the Court must decide if the exercise of jurisdiction comports with due process. In order to satisfy due process, the defendant must have "minimum contacts" with the forum state such that the maintenance of the action does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A restatement of this standard is found in a more recent Supreme Court case, *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), which held that a defendant's contacts with the state must be sufficient to make it fair and reasonable for the state to subject that defendant to its jurisdiction.

### a. CPLR § 301

A foreign corporation is amenable to suit in New York pursuant to CPLR § 301 if it is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of its 'presence' in this jurisdiction." *Delagi v. Volkswagenwerk A.G.*, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 655–56, 278 N.E.2d 895 (1972). Plaintiff has not alleged that the non-UIS Defendants have any office or place of business in New York, that they engage in any business in New York or that they have any personnel engaging in any business in New York. The only basis of plaintiff's assertion of jurisdiction pursuant to § 301 is that "GAN" owns three subsidiaries licensed to do business in New York. *See* Cmplt. at ¶ 11.

■ In order to find a foreign corporation present in New York based on the New York activities of its subsidiary, plaintiff must show either that (1) the subsidiary "does all the business which [the parent corporation] could do were it here by its own officials," and thus is an "agent" of the parent, *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 44, 227 N.E.2d 851 (1967), or (2) that the

---

8. Defendants also argue that even by the terms of the contract as alleged, the agreement did not encompass the acquisition of UIC. This issue, which goes to the scope of the agreement, is also more appropriately resolved at a later stage of the litigation.

parent's control of the subsidiary is "so complete that the subsidiary is, in fact, merely a department of the parent," *Delagi*, 328 N.Y.S.2d at 657, 278 N.E.2d 895.

■ The only fact that plaintiff offers in support of jurisdiction under these tests is that GAN S.A.'s web page states that it is "present in 20 countries." Although promotional materials can support a finding of jurisdiction where they "indicate an extremely close relationship between the parent and the subsidiary, such that they should be thought of as interconnected, the subsidiary being a branch office of the parent," *Koehler v. Bank of Bermuda, Ltd.*, Nos. 931745, M18–302, 1994 WL 48825, at *2 (S.D.N.Y. Feb. 16, 1994), the single reference cited by plaintiff clearly does not meet this standard. Having alleged no facts suggesting that the subsidiaries licensed in New York are agents or departments of any of the defendants, plaintiff has failed to make a prima facie showing of jurisdiction under CLPR § 301.

**b. § 302(a)(1)**

To assert jurisdiction under § 302(a)(1), plaintiff must show that defendant transacted business within the state and that the cause of action arose out of that transaction. *McGowan v. Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981). A defendant "transacts business" in New York when it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *McKee Electric Co., Inc. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 37–38, 229 N.E.2d 604 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Reiss does not allege that any officer or employee of any of the non-UIS Defendants ever came to New York with respect to the matters at issue in this suit, ever sent any correspondence to him in New York or had any conversations with him in New York. The only interaction Reiss had with any representative of any of these

defendants was the meeting with Guy de Chavanne at the Hotel Vernet in France. Thus, the sole basis for Reiss' assertion of jurisdiction over the non-UIS Defendants is his argument that Juliard—the individual with whom Reiss allegedly entered into the oral agreement in 1992—was functioning as their agent in New York.

In order to assert jurisdiction over these defendants based upon Juliard's New York activities, "[p]laintiff need not establish a formal agency relationship." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 199, 522 N.E.2d 40 (1988). Rather, Reiss "need only convince the court that [the agent] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of [defendants] and that they exercised some control over [the agent] in the matter." *Id.* Thus, "courts have focused on the realities of the relationship in question rather than the formalities of agency law." *CutCo Ind., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).

Reiss' contention that these defendants were exercising control over Juliard's actions is based almost entirely on the statements of Juliard, the alleged agent: Reiss alleges that Juliard told him that "GAN" had asked Juliard to find a buyer for UIS and UIC, and that Juliard had told Reiss in the past that Juliard had obtained approval from "GAN" on important matters. In addition to these statements, Reiss alleges that Juliard obtained approval from "GAN" to use the Groupe Percier–Allied Partner name and that "GAN" reviewed confidentiality agreements regarding UIS and UIC, which Juliard gave to GECC. Finally, Reiss attended the Hotel Vernet meeting in France with Rosio, Juliard, and de Chavanne.

■ The degree of control that a principal must exercise over an agent in order to subject the principal to jurisdiction in New York has not been defined with any precision, and it is certainly a fact-specific ques-

tion. Even if the above allegations, accepted as true, are sufficient to show that Juliard was acting under some control of at least one of the defendants, I nonetheless conclude that the exercise of jurisdiction in this situation would not comport with due process. As discussed below, Reiss has not alleged facts sufficient to prove that GAN S.A., Société, or UIC engaged in any conduct or communications to clothe Juliard with the apparent authority to enter into the finder's fee agreement on their behalf. He argues, instead, that Juliard had the actual authority to bind the non-UIS Defendants. The Amended Complaint, however, is deficient in one vital respect: it fails to identify on whose behalf Juliard was acting. Rather, as described above, it refers to the general term "GAN" to encompass both Société and GAN S.A.

A third party who is relying upon an agent's actual authority to bind his principal is constrained by the precise parameters of that authority. "An agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." *Ford v. Unity Hospital,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 244, 299 N.E.2d 659 (1973); *accord Herbert Construction Co. v. Continental Ins. Co.,* 931 F.2d 989, 995 (2d Cir.1991).

The Court permitted the parties to submit excerpts from Reiss' deposition. These excerpts are entirely clear that although he may have believed that Juliard represented "GAN," Reiss made no effort to ascertain which company "GAN" actually was. He acknowledges that he had no basis, prior to the institution of this lawsuit, to distinguish among the many GAN

entities—of which defendants claim there are more than twenty—but rather relied upon his attorney to pick the appropriate defendants in the suit. Reiss states that he trusted Juliard, and thus was not concerned about the specific entity that "would pay the bill."

Reiss has named two GAN entities in the Amended Complaint—GAN S.A. and Société. The assertion of jurisdiction over a third entity, UIC, is predicated upon jurisdiction over "GAN."[9] He currently seeks to add two additional GAN parties as defendants.[10] Reiss relied solely upon his relationship with Juliard and he failed to identify or seek reassurance from any alleged principal. Defendants submit that it would offend due process to allow Reiss to subject multiple foreign defendants— who have never entered New York—to a suit here in order to determine if, in fact, Juliard was acting as the agent of any of the non-UIS Defendants and, if so, what was the precise scope of that authority. I agree.

### D. Failure to state a claim—GAN S.A., Société, UIC

Like the basis for jurisdiction, the ground for Reiss' assertion that the non-UIS Defendants are liable for the finder's fee is the allegation that Juliard functioned as these defendants' agent when he entered into the oral finders' fee agreement. Reiss argues that these defendants gave Juliard actual authority. I find, however, that he has failed to plead either actual or apparent authority.

#### a. Actual Authority

"Actual authority 'is created by direct manifestations from the principal to the agent, and the extent of the agent's actual

---

9. Reiss' sole basis for jurisdiction over UIC is the single allegation that Juliard told him that "GAN" wanted Juliard to find a buyer for UIC. Thus, under Reiss' theory, premised on the assumption that "GAN" could act for UIC, the assertion of jurisdiction over UIC is dependent upon jurisdiction over "GAN."

10. Reiss seeks to add GAN Vie and GAN Incendie Accidents et Risques Divers as defendants.

authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware.'" *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.1997) (citing *Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir.1968)).

■ The Amended Complaint fails to allege facts demonstrating that GAN S.A., Société or UIC authorized Juliard to enter into the finder's fee agreement on their behalf, or even that they were aware of the existence of the agreement.[11] The basis of the claim that Juliard possessed actual authority is Juliard's statements to Reiss: Juliard's representation that "GAN" had authorized him to find a buyer for UIS and UIC, and Juliard's statements to Reiss that he had to obtain approval from "GAN" on all important matters. *See* Cmplt. at ¶¶ 33, 78. These allegations are inadequate for a number of reasons.

Juliard's statements are insufficient, as a matter of law, to prove that he actually had authority to act on behalf of GAN S.A., Société or UIC. Actual authority must be given by the principal to the agent, and thus affirmative acts emanating from the principal must be proven to establish this authority. The alleged agent cannot grant himself this authority. *Tarstar Shipping Co. v. Century Shipline Ltd.*, 451 F.Supp. 317, 323 (S.D.N.Y.1978) (stating that agency cannot be proven merely by offering "the self-serving statements of the purported agent"), *aff'd*, 597 F.2d 837 (2d Cir.1979); *Brookfield Clothes, Inc. v. Tandler Textiles, Inc.*, 78 A.D.2d 841, 433 N.Y.S.2d 161, 162 (1st Dep't 1980) (affidavit by agent swearing that he had authori-

ty to act was not sufficient to prove that agent actually had authority).

Even if Juliard's statement that he was authorized by the non-UIS Defendants to find a buyer for UIS and UIC is accepted as true, the Amended Complaint is still insufficient: there is a conspicuous absence of any allegation that "GAN" authorized Juliard to retain a "finder" in connection with his efforts to locate this buyer. Plaintiff attempts to avoid this deficiency by arguing that Juliard's authority to identify a buyer for UIS and UIC included the implied or incidental authority to retain a finder and pay him his customary fee. *See* Restatement (Second) of Agency § 35 (1958) (authority to conduct a transaction includes authority to do acts which are "incidental to the transaction, usually accompanies the transaction, or [are] reasonably necessary to accomplish the transaction"). Plaintiff cites to an example provided by the Restatement: a principal who employs an agent to photograph Eskimo life impliedly gives the agent authority to employ an interpreter and make small gifts to the Eskimos to induce them to permit him to make photographs.

Plaintiff's application of this principle to the facts of this case, however, stretches it too far. Indeed, he cites no authority with similar facts. Under plaintiff's theory, by asking Juliard to find a buyer for UIS and UIC, the non-UIS Defendants impliedly granted him the authority to enter into a contract that would make them liable for millions of dollars. Such a contract cannot be characterized as "incidental to" or "reasonably necessary to" the ultimate task. Nor has plaintiff alleged any facts to support a finding that when a French company authorizes an agent to find a buyer, this

---

11. Reiss alleges that he attended the Hotel Vernet meeting with de Chavanne, Juliard, Rosio and representatives of GECC, at which GECC's potential investment in UIS and UIC was discussed. The only specific communication alleged to have occurred at the meeting relevant to this dispute, however, is that de Chavanne informed a GECC representative

that he would be receiving some information about UIC once a management change at UIC had occurred. *See* Cmplt. at ¶ 109. Moreover, although Reiss alleges that "GAN" approved the use of the Groupe Percier–Allied Partners name, there is no allegation that anyone at "GAN" knew of any actions Reiss had undertaken.

grant is usually accompanied by the further grant of authority for the agent to, in turn, hire its own agent.

### b. Apparent Authority

 In the absence of a grant of actual authority, a principal may nonetheless be bound if he has clothed the agent with the apparent authority to conduct that transaction. Unless "the facts and circumstances are such to put him on inquiry," or the transaction is extraordinary or novel, a third party relying on the agent's apparent authority does not possess the duty to inquire into its scope. *Herbert Constr.*, 931 F.2d at 995–96. Essential to a finding of apparent authority, however, is conduct on the part of the principal. *Chemical Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 130 (2d Cir.1999) (apparent authority "requires that the third party demonstrate some manifestation attributable to the principal"); *see also Hallock v. State*, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984) (apparent authority requires "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction"). "The agent cannot by his own acts imbue himself with apparent authority." *Id.*

Reiss has not pled any facts to support a finding that the non-UIS Defendants cloaked Juliard with the apparent authority to enter into a finder's fee agreement. Plaintiff does not allege or argue that any representative of defendants ever had any communication with him. In fact, plaintiff does not allege or argue that he relief on any conduct emanating from anyone other than Juliard; rather, he contends that Juliard had the express and implied authority to agree to pay Reiss the finder's fee on behalf of the non-UIS Defendants. The

only contact between any representative of these defendants and Reiss was at the Hotel Vernet meeting, and as discussed above, plaintiff alleges no statements or conduct by de Chavanne giving the appearance that Juliard possessed the authority to enter into a finder's fee agreement with Reiss.[12]

## III. Conclusion

For the reasons set forth above, the motion to dismiss is denied as to defendant UIS and granted as to defendants GAN S.A., Société and UIC. Plaintiff's motion to add two additional defendants is also denied at this time due to lack of personal jurisdiction. If Reiss discovers facts supporting a finding that any of the dismissed or new defendants gave Juliard the authority to enter into the finder's fee agreement on its behalf, Reiss will be permitted to amend the Amended Complaint to add that party as a defendant.

---

**12.** The only other conduct allegedly taken by "GAN" is that it approved UIS' use of the name Groupe Percier–Allied Partners and that it reviewed a confidentiality agreement relating to UIS and UIC. *See* Cmplt. at ¶¶ 67–72, 88–93. Even if true, these acts, like the

Hotel Vernet meeting, occurred subsequent to the alleged oral agreement and thus could not have clothed Juliard with the appearance that he had the authority to enter into that agreement.